UNITED STATES of America,
Plaintiff-Appellant,

v.

Charles E. CARSON, being the same person as Charles Edward Carson,

and

W. R. Ellis, d/b/a Ellis Livestock Commission Company, Defendants-Appellees.

No. 16801.

United States Court of Appeals
Sixth Circuit.

Feb. 8, 1967.

430

Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., for appellant, John W. Douglas, Asst. Atty. Gen., Robert J. Vollen, Atty., Dept. of Justice, Washington, D. C., Thomas L. Robinson, U. S. Atty., Memphis, Tenn., on the brief.

Arthur J. Shea, Jr., Memphis, Tenn., for appellees.

Before McCREE, Circuit Judge, Mc-ALLISTER, Senior Circuit Judge, and WEINMAN, District Judge.*

McCREE, Circuit Judge.

We consider herein an appeal by the United States from a verdict in its favor against defendant Ellis in an action for conversion.

Upon obtaining an operating loan under the Bankhead-Jones Farm Tenant Act, 7 U.S.C. § 1941 et seq., defendant Carson executed a promissory note payable to the United States in the amount of $18,000.00. This note was secured by a mortgage evidenced by a duly recorded "Mississippi Chattel Deed of Trust" on

---

* Honorable Carl A. Weinman, Chief Judge, United States District Court for the Southern District of Ohio, sitting by designation.

livestock and other chattels located in Mississippi. By the terms of the deed of trust, Carson agreed not to sell or encumber the covered property without government consent. Contrary to this agreement, however, he delivered cattle covered by the deed to defendant Ellis, a Tennessee livestock broker, who sold the livestock in Memphis, Tennessee, for $1877.31 and transferred the proceeds to Carson, retaining $235.40 which represented commissions and an advance. Subsequently, Carson was declared bankrupt, and the amount of his debt to the United States was reduced to $1000.00.

The government, basing jurisdiction on 28 U.S.C. § 1345, filed a complaint in the United States District Court for the Western District of Tennessee against both Carson and Ellis, claiming that these defendants had converted property in which the government had a security interest. Damages were sought in the amount of the sale price of the cattle. A consent judgment was entered against Carson in the amount of $1000.00, and the district judge ruled that recovery against Ellis could not exceed this amount. In rendering his final decision, however, the district judge held that state law would be used in determining the extent of Ellis' liability, and that since Tennessee law limits recovery in a situation such as this to the amount retained by the livestock merchant at the time demand is made, judgment would be entered against Ellis in the amount of $235.40. On appeal from the decision of the district court, the government contends that liability for conversion of property in which it has obtained a security interest under a wide-reaching federal loan program is governed by federal law, and that the correct measure of damages under federal law is the fair market value of the property.

The question of which law should govern in a situation like this has been considered by four courts of appeals. The Ninth Circuit in United States v. Matthews, 244 F.2d 626 (1957), and the Third Circuit in United States v. Sommerville, 324 F.2d 712 (1963), have upheld the government's position. The Eighth Circuit in United States v. Kramel, 234 F.2d 577 (1956), and the Fourth Circuit in United States v. Union Livestock Sales Co., 298 F.2d 755, 96 A.L.R. 2d 199 (1962), have held that state law provides the applicable rule. Far more is involved here than a few head of cattle. This case raises serious issues both of federalism and of the separation of powers of the branches of the federal government. Cognizant of the difficulty of these issues we hold, for the reasons presently to be stated, that the situation is governed by a uniform federal law, and we further hold that the market value of the property rather than the amount retained by the converter is the appropriate measure of damages.

## I. The Applicable Law

In contending that federal law should govern, appellant properly places much reliance on the decision of the Supreme Court in Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L. Ed. 838 (1943), wherein it was held that the right of the United States as drawee of a government check to avail itself of Clearfield's guaranty of prior endorsements was governed by federal law, and that under federal law delay by the drawee in asserting its claim would not provide a defense for the guarantor unless it could be shown that the delay caused a manifest loss. The Court said:

> We agree with the Circuit Court of Appeals that the rule of Erie R. Co. v. Tompkins, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188], does not apply to this action. The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. This check was issued for services performed under the Federal Emergency Relief Act of 1935, 49 Stat. 115. The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Penn-

sylvania or of any other state. Cf. Board of Commissioners v. United States, 308 U.S. 343 [60 S.Ct. 285, 84 L.Ed. 313]; Royal Indemnity Co. v. United States, 313 U.S. 289 [61 S.Ct. 995, 85 L.Ed. 1361]. The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources. Cf. Deitrick v. Greaney, 309 U.S. 190 [60 S.Ct. 480, 84 L.Ed. 694]; D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp., 315 U.S. 447 [62 S.Ct. 676, 86 L.Ed. 956]. In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards. 318 U.S. at 366, 367, 63 S.Ct. at 574.

■ *Erie,* which curtailed the power of the federal courts to enunciate federal common law when federal jurisdiction was founded solely on diversity of citizenship, was concerned with the unconstitutionality of federal judicial lawmaking in areas beyond the reach of Congressional legislation. 304 U.S. at 72, 58 S.Ct. 817. *Clearfield* and the cases cited therein emphasize that the federal courts should determine the governing rule or law "according to their own standards" in areas where constitutionally valid federal legislative programs have been commenced. Where a decision is likely to have a substantial effect on the implementation of a federal program, then a federal court should declare a rule consistent with the program's demands. Congresss, of course, is the primary source of federal law, and the federal courts must adhere to the intent of Congress whenever this intent is discernible. When congressional intent is not expressed or otherwise ascertainable, however, the courts may, within reasonable bounds, utilize the techniques of the common law to reach the appropriate rules for disposition of the controversies before them. Cf. D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,

315 U.S. 447, 472, 62 S.Ct. 676 (1942) (Jackson, J., concurring). As one writer has expressed it,

> the separation of powers cannot be watertight; exclusive reliance upon statutory provision for the solution of all problems is futile. Beyond the political realities which will at times compel congressional by-passing of any issue—thus leaving it open until pending litigation forces court resolution—lies such simpler pressures as shortness of time and, perhaps more important, the severe limits of human foresight. Together, these factors combine to make the concept of statutory enactment as a totally self-sufficient and exclusive legislative process entirely unreal. At the very least, effective Constitutionalism requires recognition of power in the federal courts to declare, as a matter of common law or 'judicial legislation,' rules which may be necessary to fill in interstitially or otherwise effectuate the statutory patterns enacted in the large by Congress.[1]

The Court noted in *Clearfield:*

> In our choice of the applicable federal rule we have occasionally selected state law. See Royal Indemnity Co. v. United States, supra. 318 U.S. at 367, 63 S.Ct. at 575.

Hence, even in situations where the federal courts are not bound by the constitutional principles underlying *Erie* to apply state law, they might refrain from enunciating a federal rule applicable throughout the nation. The presence of a federal program permits the federal courts to make a choice, but does not of itself determine what the choice will be. In the instant situation, however, formulation of a uniform federal rule, rather than adoption of the laws of the several states as the federal rule, is the more appropriate alternative.

■ The Bankhead-Jones Farm Tenant Act established an extensive federal lending program to help assure the

---

1. Mishkin, "The Variousness of 'Federal Law': Competence and Discretion in the Choice of National and State Rules for Decision," 105 U.Pa.L.Rev. 797, 800 (1957).

efficient and productive use of our agricultural resources. The act requires that the loans made by the government be adequately secured. 7 U.S.C. § 1946. A uniform federal rule governing the liability of livestock brokers dealing tortiously with mortgaged property will help prevent the security interests of the United States from being unjustifiably defeated. See United States v. Sommerville, supra. The tort involved here is not of such novelty as to require judicial inaction until Congress has spoken. Compare United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L. Ed. 2067 (1947).

In United States v. Helz, 314 F.2d 301 (6th Cir. 1963), a case involving an unsecured loan made under the National Housing Act, 12 U.S.C. § 1702 et seq., this court held that federal law governed the rights of the parties, and that under federal law the Michigan defense of coverture would not be adopted and the United States would therefore be permitted to recover from a married woman. The following statements in *Helz* with regard to the policies underlying the decision apply with equal force here:

> In cases affecting government money and the credit of the government, the authorities set up the principle that federal law should apply. This principle is true in cases arising under the National Housing Act. As an example, the Court said in the case of United States v. View Crest Garden Apts., Inc., 268 F.2d 380 (C.A.9) 1959, cert. denied 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed.2d 120:
>
> > 'Now the federal policy to protect the treasury and to promote the security of federal investment which in turn promotes the prime purpose of the Act—to facilitate the building of homes by the use of federal credit—becomes predominant. Local rules limiting the effectiveness of the remedies available to the United States for breach of a federal duty can not be adopted.' * * *

We reach the conclusion that federal law should apply in the case, not the local law of Michigan, and that in fashioning such federal law we rule that the old common law defense of coverture to an action on a note executed by a married woman under the National Housing Act, is not a valid defense. 314 F.2d at 303.

United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), the most recent decision of the Supreme Court which considers the kind of choice-of-law question presented here, indicates that even where the pecuniary interests of the federal government under a broad lending program are involved, there may be factors present which make advisable the adoption of state law. The elements decisive of *Yazell*, however, are absent here.

In *Yazell*, a Small Business Administration disaster loan was made to Mr. and Mrs. Yazell, and the government urged that Mrs. Yazell should be precluded by federal law from relying on the Texas law of coverture to protect her separate property from the government's efforts to obtain repayment of the loan. Mr. Justice Fortas stated the central issue of the case as follows:

> The issue is whether the Federal Government may voluntarily and deliberately make a negotiated contract with knowledge of the limited capacity and liability of the persons with whom it contracts, and thereafter insist, in disregard of such limitation, upon collecting (a) despite state law to the contrary relating to family property rights and liabilities, and (b) in the absence of federal statute, regulation or even any contract provision indicating that the state law would be disregarded. 382 U.S. at 350–351, 86 S.Ct. at 506.

In the present case, there is no evidence that the FHA-Carson agreement was the type of "custom-made, hand-tailored, specifically negotiated transaction" (382 U.S. at 348, 86 S.Ct. at 504) which the Supreme Court determined the SBA-Yazell loan to have been, and on which the Court relied heavily in its decision. The Court in fact distinguished

*Yazell* from *Clearfield,* supra, and from this circuit's *Helz* decision, supra, in the following manner:

> Contrast Clearfield Trust Co. v. United States, 318 U.S. 363 [63 S.Ct. 573]. Compare also United States v. Helz, 314 F.2d 301 (C.A.6th Cir.), arising under the National Housing Act, 48 Stat. 1246, 12 U.S.C. § 1702 et seq., which issues separate forms for each State but does not negotiate with individual applicants. 382 U.S. at 348, 86 S.Ct. at 504.

Even if the FHA-Carson agreement had been as carefully negotiated as the SBA-Yazell agreement, the dispute involved here is not with the borrower, Carson, but with Ellis, who was not a party to any negotiations with the government. This is emphasized by the fact that the district judge applied the law of Tennessee, the place of sale, rather than the law of Mississippi under which the agreement was drawn.[2] Hence, the suggestion in *Yazell* that the government was attempting to exercise a right which it abandoned by failing to insist upon it during negotiations is inapposite here.

382 U.S. at 350, 86 S.Ct. 500, see Comment, 65 Mich.L.Rev. 362–63 (1966).

There is another important difference between the instant case and *Yazell.* This case does not involve the "peculiarly local" (382 U.S. at 353, 86 S.Ct. 500) matter of family property rights and liabilities involved there. Federal courts have frequently adopted state law even in areas of federal interest where family relationships are concerned, see, e. g., DeSylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), although the Supreme Court's approval of *Helz* indicates that such deference is not always necessary.[3] In any event, we are concerned here with the extent of liability to be imposed when government property is tortiously mishandled in a commercial situation, a situation in fact involving an interstate transaction. No state rule designed to protect the familial relationships or basic property rights of its citizens has been invoked.

Finding, then, that the enunciation of a uniform federal rule will serve the purpose of assuring that the security interests contemplated by the farm loan

2. Although not urged by appellee as a ground for applying state law, it might be argued that the use of Mississippi recording procedures by the government suggests that state law should be adopted with regard to the liability of the auctioneer. However, as the Ninth Circuit pointed out in United States v. View Crest Garden Apts., Inc., 268 F.2d 380, 383:
> It is commercially convenient to adopt existing state systems as it saves the expense of setting up a whole new federal recording system and it enables persons checking ownership interests in property to refer to one set of record books rather than two. * * * A different set of factors come into play when the planning stage and the working stages of the agreement have been terminated. After a default the sole situation presented is one of remedies. Commercial convenience in utilizing local forms and recording devices familiar to the community is no longer a significant factor.

3. Where the Supreme Court has deemed the situation to be an appropriate one

for the adoption of state law, it has pointed out that state law will be adopted only insofar as it "affords a convenient and fair mode of disposition." United States v. Standard Oil Co., 332 U.S. 301, 309, 67 S.Ct. 1604, 1609 (1947). In DeSylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974 (1956), for example, the Court adopted the state definition of "children" for purposes of the copyright laws, but pointed out:
> This does not mean that a State would be entitled to use the word "children" in a way entirely strange to those familiar with its ordinary usage, but at least to the extent that there are permissible variations in the ordinary concept of "children" we deem state law controlling. 351 U.S. at 581, 76 S.Ct. at 980.

Even if it were decided that state law should generally be adopted in determining the liability of auctioneers, the fact that the Tennessee rule invoked by appellee is followed in only a handful of states might indicate that it should be rejected as an unacceptable variation of the standard rule.

legislation will not be unjustifiably defeated, and finding further that no compelling local interest indicates the adoption of state law, we proceed to the determination of what the federal rule will be.

## II. The Extent of Liability

 In United States v. Union Livestock Sales Company, supra, the Fourth Circuit said the following with respect to the liability of a livestock auctioneer who unauthorizedly sells property in which a third party has a security interest:

> The almost universally accepted rule is that an agent, factor, commission merchant or auctioneer who receives property from his principal and sells it and pays the proceeds of the sale to him is guilty of conversion if the principal has no title to the property, even though the agent acts without knowledge of the defect in the title. See Restatement of Agency, 2nd, Section 349, and Appendix pages 575–6; Restatement of Torts, Section 233; 20 A.L.R. 132–138; 22 Am.Jur., Factors, Section 48; 5 Am.Jur., Auctions, Section 60; 2 Jones, Chattel Mortgages, Section 460. In a few cases the innocent factor or auctioneer engaged in the sale of property subject to a chattel mortgage has been held free from liability, particularly where the sale occurred out of the jurisdiction where the mortgage was recorded. Hernandez v. Aaron (1895), 73 Miss. 434, 16 So. 910; J. T. Fargason Co. v. Ball (1913), 128 Tenn. 137, 159 S.W. 221, 50 L.R.A., N.S., 51; Drovers' Cattle Loan and Investment Co. v. Rice (D.C. Iowa), 10 F.2d 510. On the other hand even in a situation of this kind the general rule imposes liability upon the innocent agent. See United States v. Matthews, 244 F.2d 626; Birmingham v. Rice Bros. (1947), 238 Iowa 410, 26 N.W.2d 39, 2 A.L.R.2d 1108; Walker v. Caviness (Tex.Civ.App.1953), 256 S.W.2d 880. 298 F.2d at 760.

Liability being for conversion, the appropriate measure of damages would be the fair market value of the property at the time the conversion took place.

 The foregoing rule—namely, that an auctioneer is liable for conversion to the holder of a security interest in property which he has sold even if unaware of the existence of the security interest—has been applied as the federal law by the two courts of appeals which have decided that the instant situation is to be governed by a uniform federal rule. United States v. Matthews, supra; United States v. Sommerville, supra. We join them and apply it here. We also take note of the fact that this rule is followed in nearly all the states. The formulation of a uniform federal rule does not require that the wisdom of the states be disregarded, and the federal rule may correspond to the rule applied in many states.

For the reasons stated, the decision of the United States District Court for the Western District of Tennessee is reversed, and the case is remanded for the entry of a judgment in conformity with the foregoing opinion.

Reversed and remanded.