**UNITED STATES of America,
Appellant,**

v.

**STADIUM APARTMENTS, INC., et al.,
Appellee.**

**No. 22708.**

United States Court of Appeals,
Ninth Circuit.

April 14, 1970.

Rehearing Denied June 15, 1970.

Sherman Furey, U. S. Atty., Boise, Idaho, Wm. D. Ruckleshaus, Asst. Atty. Gen., Civ. Div., Dept. of Justice, Washington, D.C., for appellant.

Thomas C. Lynch, Atty. Gen. of Cal., Slade Gorton, Atty Gen. of Olympia, Wash., Gary K. Nelson, Atty. Gen. of Phoenix, Ariz., Allan G. Shepard, Atty. Gen. of Idaho, Boise, Idaho, Frank G. Lujan, Atty. Gen. of Territory of Guam, Agana, Guam, amicus curiae.

Before DUNIWAY and ELY, Circuit Judges, and SMITH,* District Judge.

DUNIWAY, Circuit Judge:

This case presents the question whether state redemption statutes should apply when the Federal Housing Authority (FHA) forecloses a mortgage which it has guaranteed. We hold that such statutes do not apply.

The federal statute here involved is Title VI of the National Housing Act, 12 U.S.C. §§ 1736–1746a. The stated objective of Title VI is "to assist in relieving the acute shortage of housing * * * available to veterans of World War II at prices within their reasonable ability to pay * * *." 12 U.S.C. § 1738(a). The statute confers authority upon the Secretary (formerly the Commissioner) "to make such rules and regulations as may be necessary to carry out the provisions of this subchapter." 12 U.S.C. § 1742. Such regulations were promulgated, and those that were in force in November 1949, when the mortgage here in question was executed and insured appear in the 1947 Supplement to the Code of Federal Regulations. (24 C.F.R. § 580 (1947 Supp.).) Citations to C.F.R. in this opinion are to the 1947 supplement.

The way in which the Act and regulations operated are well illustrated in this case. In 1949, appellee Stadium Apart-

ments, Inc., desired to construct, under Title VI, an apartment house in Caldwell, Idaho. It applied to Prudential Insurance Company for a loan. Such a loan was eligible for insurance under 12 U.S.C. § 1743(a). The conditions for eligibility are set out in 12 U.S.C. § 1743(b). The mortgagor must be approved by the Secretary, who can impose certain regulations upon both the mortgagor and the property mortgaged. Certain terms of the mortgage are also prescribed. Application for approval was made, as required by 24 C.F.R. §§ 580.1–580.7. The FHA then issued a commitment of insurance, as required by 24 C.F.R. § 580.8. The mortgage was executed upon a form prescribed by FHA, and accepted for insurance. 24 C.F.R. §§ 580.10–580.37. The amount of the insured loan was $130,000. The mortgage contained this provision:

> "The Mortgagor, to the extent permitted by law, hereby waives the benefit of any and all homestead and exemption laws and of any right to a stay or redemption and the benefit of any moratorium law or laws."

Stadium Apartments defaulted in 1966, and Prudential assigned the mortgage to the Secretary of Housing and Urban Development, pursuant to 12 U.S.C. § 1743(c). The Secretary paid Prudential the amount then due, as required by 12 U.S.C. § 1743(c). The United States then obtained a default judgment foreclosing the mortgage, 12 U.S.C. §§ 1713(k), 1743(f). The district judge, in spite of the foregoing provision, framed the foreclosure decree to allow for a one-year period of redemption, as provided by 2 Idaho Code § 11–402.[1] The question is whether this was error.

Stadium Apartments, Inc., having defaulted, is not represented here. Be-

---

* Honorable Russell E. Smith, United States District Judge, District of Montana, sitting by designation.

1. The marshal's sale took place on December 12, 1967, so that the redemption peri-

od has now elapsed. However, we are informed that an application to redeem the property was made on December 9, 1968, within the redemption period, and is still pending. Therefore, the case is not moot.

cause the question is of some importance, we were disturbed that the government had chosen to appeal this uncontested case, when hitherto the FHA has at times consented to decrees providing for post-sale redemption rights as required by state laws.[2] We therefore determined, following the initial oral argument in which only government counsel appeared, that the Attorneys General of the states within our circuit and of the Territory of Guam should be invited to submit amicus curiae briefs. The State of California has done so, taking a position opposed to that advocated by the government. Washington, Arizona and Guam adopt California's view. We were also unsure that the government's position in this case comported with the policies of various federal lending agencies; hence, we requested information from the government regarding such policies, as well as relevant statistics on past lending practices. Armed with this information, and additional briefs, and having now had the benefit of further oral argument, we are more fully prepared to render our decision.

It is settled that the applicable law is federal. In a decision that has become a leading case on the question, United States v. View Crest Garden Apts., Inc., 9 Cir., 1959, 268 F.2d 380, 381, arising

under the National Housing Act, Title II, 12 U.S.C. § 1707 ff. we held:

"But we do find it to be clear that the *source* of the law governing the relations between the United States and the parties to the mortgage here involved is federal. (Citations omitted) * * * It is therefore equally clear that if the law of the State of Washington is to have any application in the foreclosure proceeding it is not because it applies of its own force, but because either the Congress, the FHA, or the Federal Court adopts the local rule to further federal policy." 268 F.2d at 382.

■ The first question is whether the Congress adopted state law in its definition of "mortgage" and "first mortgage." California argues that it did. The language relied upon appears in 12 U.S.C. § 1736(a), and reads:

"The term 'mortgage' means a first mortgage on real estate, in fee simple, or on a leasehold (1) under a lease for not less than ninety-nine years which is renewable; or (2) under a lease having a period of not less than fifty years to run from the date the mortgage was executed; and the term 'first mortgage' means such classes of first liens as are commonly given to secure advances on, or the unpaid pur-

2. In Clark Investment Co. v. United States, 9 Cir., 1966, 364 F.2d 7, the United States had apparently acquiesced in inclusion of a right of redemption in the foreclosure decree. In Madison Properties, Inc. v. United States, 9 Cir., 1967, 375 F.2d 740, the district court "recognized that it was the custom of the U.S. Marshal in the district to follow Washington state law, allowing redemption within a year after foreclosure sale, and that the sale in this case had referred to this custom." We held that the debtor had not complied with Washington procedures, assuming *arguendo* that Washington law applied. In United States v. View Crest Garden Apts., Inc., 9 Cir., 1959, 268 F.2d 380, 383, in holding that federal law determined standards to be followed in appointing receivers we said: "It is urged that to hold that federal law

applies would result in great hardship to mortgagors who would thereby be deprived of all rights under state law such as the right of redemption. We do not think that such a conclusion necessarily follows. A court confronted with that question could determine it by weighing the federal interest against the particular local policy involved." In United States v. West Willow Apts., Inc., E.D.Mich., 1965, 245 F.Supp. 755, a redemptive period was included at the request of the purchaser at the mortgage foreclosure sale, and with the acquiescence of the United States, because title insurers would not insure the title without such a provision, which was required by state law. Thus, the instant case is the first in which the United States has argued that state redemption laws should not be followed.

chase price of, real estate, under the laws of the State in which the real estate is located, together with the credit instruments, if any, secured thereby."

We rejected California's argument in View Crest, *supra,* where identical language in 12 U.S.C. § 1707 was relied upon. We said:

"The argument is that in adopting the state definition of 'first mortgage,' Congress intended to adopt *all* the incidents of the mortgage relation under state law including remedies on default and the appointment of receivers. That this is not the case is clear from reading section 1713 of the same Act which defines certain acts as being in default (part g) and sets out certain remedies that the FHA can pursue such as institution of foreclosure (part k) proceedings without reference to whether or not there is such a remedy for the default described in the State where the property is located. Moreover, there is no apparent reason for assuming that Congress in incorporating by reference certain duties under state law also meant to restrict the United States to the state remedies for breach of those duties \* \* \*." 268 F.2d at 382.

We then proceeded to point out the convenience inherent in defining "first mortgage" in terms of local law, thus making available local recording acts, and continued:

"A different set of factors come into play when the planning stage and the working stages of the agreement have been terminated. After a default the sole situation presented is one of remedies. Commercial convenience in utilizing local forms and recording devices familiar to the community is no longer a significant factor. Now the federal policy to protect the treasury and to promote the security of federal investment which in turn promotes the prime purpose of the Act—to facilitate the building of homes by the use of federal credit—becomes predominant. Local rules limiting the effectiveness of the remedies available to the United States for breach of a federal duty can not be adopted." 268 F.2d at 383.

We think that the validity of this approach is emphasized by the fact that the definition relied upon does *not* refer to state law in defining "mortgage"; it does so only in defining "first mortgage." And the statute now before us, like the statute considered in *View Crest,* defines default without reference to state law (12 U.S.C. §1743(c)) and provides for remedies without reference to state law (12 U.S.C. § 1743(c)) and porating the provisions of § 1713(k)). No other federal statute is relied upon.[3]

We conclude that the Congress did not adopt state redemption statutes as part of the federal law.

■ The second question is, did the FHA adopt those statutes? California says that it did, relying on two arguments. First, it points to the regulations. 24 C.F.R. § 580.18 provides:

"The mortgage must contain a provision or provisions, satisfactory to the Commissioner, giving to the mortgagee, in the event of default or foreclosure of the mortgage, such rights and remedies for the protection and preservation of the property covered by the mortgage and the income therefrom, as are available under the law or custom of the jurisdiction."

No similar provision exists for the mortgagor. Instead, 24 C.F.R. § 580.21 merely provides:

"The mortgage may contain such other terms, conditions and provisions with respect to \* \* \* foreclosure proceedings \* \* \* and other mat-

---

3. 28 U.S.C. § 2410(c) provides for a one-year post-sale right of redemption as a condition of jurisdiction over the United States when the United States is a junior lienor. This provision is made inapplicable to the National Housing Act by 12 U.S.C. § 1701(k).

ters as the Commissioner may in his discretion prescribe or approve."

To be eligible for insurance the mortgage must be executed on a form approved by the Federal Housing Commissioner. (4 C.F.R. § 580.10.)

We cannot find in this language an adoption of state redemption statutes. If anything can be said for it, it is that § 580.21 permits a provision against such rights.

■ Second, California points to the waiver language contained in the mortgage, quoted above in our statement of facts, and particularly to the phrase "to the extent permitted by law." This phrase, California says, must refer to Idaho law, because (1) there is no other law to which it can refer and (2) the mortgage form was prepared for use in Idaho. The argument is buttressed by the contention that there are no federal homestead or exemption laws, or rights to a stay, or redemption or moratorium laws. Cf. Madison Properties, Inc. v. United States, *supra*, n. 2. We agree that such laws are state laws, but the question is, what law is referred to as permitting that their benefits be waived? It must be the law applicable to this mortgage, which is, as we have seen, federal law. And there is no federal law which says that FHA cannot condition its participation upon waiver of the benefit of such state laws. The provision is in general terms, applicable in any state; it is obviously not specifically adapted to Idaho law. We find the waiver provision merely precautionary, and not an adoption of the local law.

■ Finally, we come to the third question: should the federal courts adopt the local law granting a post-foreclosure sale right of redemption in those states where it exists? Here, both authority and policy convince us that they should not.

Every federal appellate case dealing with the government's foreclosure remedy under insured mortgages applies federal law to assure the protection of the federal program against loss, state law

to the contrary notwithstanding. Most of the cases cite and apply the principles of *View Crest*. Many cases rely upon express provisions in the mortgage that are in conflict with local law, but frequently couch the decision in broader terms. Several of these cases involve appointment of a receiver pending foreclosure: United States v. Chester Park Apts., 8 Cir., 1964, 332 F.2d 1; United States v. Sylacauga Properties, Inc., 5 Cir., 1963, 323 F.2d 487, 491; United States v. Queen's Court Apts., Inc., 9 Cir., 1961, 296 F.2d 534, 539; United States v. View Crest Garden Apts., Inc., *supra*, cf. Director of Revenue, State of Colo. v. United States, 10 Cir., 1968, 392 F.2d 307, 311 (Small Business Administration mortgage). One such case holds that the government can collect and retain the rents during the period of redemption (consented to by the government), contrary to local Idaho law. Clark Investment Co. v. United States, *supra*, n. 2. In United States v. Queen's Court Apts., Inc., *supra*, we also held, relying on 24 C.F.R. 280.30(d) (1949 ed.) and on a comparable provision in the articles of incorporation of the mortgagor, that pending foreclosure the United States could retain a "replacement reserve fund" and need not, upon foreclosure, apply it to reduce the mortgage debt.

Other cases rely on the applicable federal regulation as controlling over local law. See United States v. Shimer, 1961, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908; United States v. Rossi, 9 Cir., 1965, 342 F.2d 505; McKnight v. United States, 9 Cir., 1958, 259 F.2d 540, 543–544, all dealing with loans guaranteed by the Veterans Administration. Each holds that the federal regulation is controlling, state anti-deficiency judgment statutes to the contrary notwithstanding, because the applicable law is federal. See also Penagaricano v. Allen Corp., 1 Cir., 1959, 267 F.2d 550, dealing with the duty to make repairs.

Many cases simply rely on principles of federal law, in the absence of directly applicable federal statutes or regula-

tions. United States v. Wells, 5 Cir., 1968, 403 F.2d 596; United States v. Walker Park Realty, Inc., 2 Cir., 1967, 383 F.2d 732; Herlong-Sierra Homes, Inc. v. United States, 9 Cir., 1966, 358 F.2d 300; and United States v. Flower Manor, Inc., 3 Cir., 1965, 344 F.2d 958. Each holds that the United States is entitled to a deficiency judgment upon foreclosure, although in each case the local law was to the contrary. United States v. Helz, 6 Cir., 1963, 314 F.2d 301, upholds a personal judgment in favor of the United States against a wife who signed a note guaranteed by FHA in spite of the contrary Michigan law of coverture. See also Director of Revenue v. United States, *supra*, 392 F.2d at 312, holding that the lien of a first mortgage to the Small Business Administration prevails over a subsequent state tax lien, in spite of local state law, and United States v. Carson, 6 Cir., 1967, 372 F.2d 429, applying federal rather than local law to sustain liability to the United States for conversion of property subject to a chattel mortgage to the United States under the Bankhead-Jones Farm Tenant Act. 7 U.S.C. § 1941 *ff*.

Through all of these cases there runs a dominant rationale, that stated by us in *View Crest, supra,*—"Now [after default] the federal policy to protect the treasury and to promote the security of federal investment which in turn promotes the prime purpose of the Act—to facilitate the building of homes by the use of federal credit—becomes predominant. *Local rules limiting the effectiveness of the remedies available to the United States for breach of a federal duty can not be adopted.*" (268 F.2d at 383, emphasis added.)

California relies heavily upon two cases, United States v. Yazell, 1966, 382 U. S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404, and Bumb v. United States, 9 Cir., 1960, 276 F.2d 729. We are convinced that the facts of these two cases are distinguishable.

*Yazell* involved a Small Business Administration disaster loan which was in-dividually negotiated "in painfully particularized detail." The loan contract referred to Texas law in several respects, and nowhere indicated that the Texas law of coverture would not apply. The Texas law, since repealed, provided that a married woman could not bind her separate property without court order. The Supreme Court held that the SBA could not

"voluntarily and deliberately make a negotiated contract with knowledge of the limited capacity and liability of the persons with whom it contracts, and thereafter insist, in disregard of such limitation, upon collecting (a) despite state law to the contrary relating to family property rights and liabilities, and (b) in the absence of federal statute, regulation or even any contract provision indicating that the state law would be disregarded". 382 U.S. at 350–351, 86 S.Ct. at 506.

The court contrasted the individually negotiated *Yazell* loan with the mortgage in United States v. Helz, *supra.* In *Helz,* the court refused to apply the Michigan law of coverture to a mortgage under the National Housing Act, foreclosed by an agency "which issues separate forms for each State but does not negotiate with individual applicants." United States v. View Crest Garden Apts., Inc., *supra,* is also cited in Yazell, 382 U.S. at 348 n. 15, 86 S.Ct. with apparent approval. The Yazell Court also emphasized that the Yazell loan involved the "intensely local interests of family property and the protection (whether or not it is up-to-date or even welcome) of married women." 382 U.S. at 349, 86 S.Ct. at 505.

In *Bumb* this court held that the Small Business Administration should have complied with a California "bulk sales" statute in perfecting its chattel mortgage, but noted that:

"it must be kept in mind that Section 3440.1 [the California Act] regulates *only the manner of acquisition of a valid security interest,* and does not purport to regulate the remedy of the mortgagee after default by the mort-

gagor * * *. This distinction was clearly recognized in United States v. View Crest Garden Apartments, Inc., *supra.* * * * " 276 F.2d at 737.

Here, too, we deal with the remedy, and as we have seen, in every such case involving federally insured mortgages, the courts have applied federal law "for the protection of the treasury and to promote the security of the federal investment."

Reasons of policy dictate the same result. In the first place, only 26 of the states provide for post-foreclosure redemption. The periods of redemption vary widely.[4] So do other conditions to redemption and the rules governing right to possession, right to rents, making repairs, and other matters arising during the redemption period. See, *e.g.,* Clark Investment Co. v. United States, *supra,* n. 2, right to rents. There is a split of authority as to whether the right of redemption can be waived.[5]

Similarly, there is a split of authority as to the right of the mortgagee to recover the value of improvements made during the redemption period.[6] It would be contrary to the teaching of every case that we have cited to hold that there is a different federal policy in each state, thus making FHA "subject to the vagaries of the laws of the several states." Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838. Which policy is to be the federal policy, that of the states which do not provide for a period of redemption, or that of those which do? And if the policy is to be the latter, is it to embrace, in each state, all of the special rules applicable in that state alone? Is it to be expanded to establish a federal right of redemption in each state where none exists under local law?

In response to our request, the government has informed us of the views of federal agencies involved in the lending

4. The following is a list, supplied by the government, of the state laws imposing post-foreclosure redemption periods, other than Idaho, and the periods prescribed:

"7 Alabama Code (Recomp.1958) 727 (2 years) ; Alaska Statutes 09.45.190, 09.35.250 (1 year) ; 4 Ariz.Rev.Stat. 12–1282 (6 months) ; 3A Ark.Stat.1947 Ann. 30–440 (1 year) ; Cal.Code Civ. Proc. 725a (1 year) ; Colorado Rev. Stat. (1963) 118–9–2 (6 months) ; 77 Ill.Ann.Stat. 18c (1 year) ; 4 Kan.Stat. Ann. 60–2414 (6 to 18 months) ; Kentucky Rev.Stat. 426.220 (1 year) ; 14 Maine Rev.Stat.Ann. 6204 (1 year) ; Mich.Stat.Ann. 27A.3140, M.C.L.A. § 600.3140 (6 months) ; Minn.Stat.Ann. 580.23 (6 months) ; 29 Vernon's Ann. Mo.Stat. 443.410 (1 year) ; 7 Rev.Code Mont. 93–5836(2) (1 year) ; 1 Rev. Stat. 21.210 (1 year) ; 5 N.Mex.Stat. Ann. 24–2–19, 24–2–19.1 (9 months) ; 6 N.Dak.Cent.Code 32–19–18 (1 year) ; 1 Or.Rev.Stat. 23.560 (1 year) ; S.D. Comp.Laws (1967) 21–52–1 et seq. (1 year) ; Tenn.Code Ann. 64–801 (2 years) ; Utah Rules Civ.Proc., Rule 69 (f) (3) (6 months) ; 4 Vermont Stat. Ann. Title 12, App. III, Rule 39 (1 year) ; Rev.Code Wash.Ann. 6.24.140 (8 months or a year) ; Wyoming Stat. 1–480 (6 months).

Wisconsin postpones the foreclosure sale until a one year period for redemp-

tion after judgment has expired. Wisconsin Stat.Ann. 278.10(2)."

5. 8 Idaho Code § 45–1508, enacted in 1957, provides that a grantor of a trust deed has no right of redemption from a sale which is made in accordance with the provisions of 8 Idaho Code § 45–1505 [sic; should read 1506], where the trust deed waives the right of redemption. See Roos v. Belcher, 1958, 79 Idaho 473, 321 P.2d 210. The few cases in other jurisdictions are split. Compare King v. King, 1905, 215 Ill. 100, 74 N.E. 89, 94, and Cook v. McFarland, 1889, 78 Iowa, 528, 43 N.W. 519 [allowing waiver] with Elson Dev. Co. v. Arizona Savings & Loan Ass'n, 1965, 99 Ariz. 217, 407 P.2d 930, and Beverly v. Davis, 1914, 79 Wash. 537, 140 P. 696 [not allowing waiver]. See 59 C.J.S. Mortgages § 821. Compare Vince v. United States, 5 Cir., 1968, 394 F.2d 462, which refused to apply Louisiana law to a Small Business Association transaction because "we find no Louisiana decisions limiting the power of such guarantors to waive the benefits of the statute."

6. See Wise v. Layman, 1926, 197 Ind. 393, 150 N.E. 368, 371; Bowen v. Boughner, 1920, 189 Ky. 107, 224 S.W. 653; 2 L.A. Jones, Mortgages, (8th ed. 1928) § 1382.

or insuring of funds for private housing purposes. These include, in addition to the Federal Housing Administration, the Farmers Home Administration of the Department of Agriculture, acting under 42 U.S.C. § 1471 *ff.*, and the Veterans Administration, acting under 38 U.S.C. § 1800 *ff.* We quote the government's response:

> "The Farmers Home Administration, the Federal Housing Administration, and the Veterans Administration have informed us that their experience has indicated that the imposition of post-foreclosure-sale redemption periods makes the foreclosure remedy more costly and administratively time-consuming in those states whose local law so provides. Generally, the reasons given in support of this conclusion are * * * that existence of a post-sale period for redemption chills bidding at the foreclosure sale,

forcing the United States to buy the property at the sale and to hold it (paying meanwhile the costs of maintenance) until the expiration of the period, when it finally can give good title to a purchaser."

Additional reasons stated by the government are quoted in the margin.[7]

We do not find the policy arguments presented by California convincing. First, it is argued that the purpose of the redemption statutes is to force the mortgagee and others to bid the full market price at the sale. We assume that this is the purpose; we are not convinced that the statutes accomplish it. What third party would bid and pay the full market value, knowing that he cannot have the property to do with as he wishes until a set period has gone by, and that at the end of the period he may not get it, but instead may be forced to accept a payment which may or may not

---

7. "The Farmers Home Administration has stated that where post-sale redemption periods have been imposed, the mortgaged property may, after sale and before expiration of the redemption period, 'stand unoccupied and unattended for considerable periods of time and consequently [may] deteriorate substantially in value, to the detriment of the financial interest of the United States and without concomitant benefit to any other party.' Similarly, the Veterans Administration reported to us that where a post-sale redemption period is imposed unless the former owner redeems timely, the mortgagee or his assignee are obligated to pay holding costs during the redemption period, *i.e.*, taxes, public improvements, if any, the cost of repairs to preserve the security, and the cost of hazard insurance premium when necessary. There is also for consideration the interest normally accruing on the outstanding investment. Moreover, many of these properties have been abandoned and must remain vacant during redemption periods. In many instances they are subject to extreme vandalism during these periods which is, of course, costly to the holder.

"Most pertinent to the present case, of course, were the comments of the Federal Housing Administration concerning foreclosures on multi-family projects like that involved here. The Federal Housing Administration reported to us:

'It is perhaps the normal situation to find any project in foreclosure to be in need of substantial repair. Many mortgagors, during a period of diminishing income, utilize the net income to keep the mortgage current as long as possible, keeping maintenance expenses to a bare minimum. When the evil day arrives that the income will no longer cover the mortgage payments, he falls into default, and the subject of the foreclosure action is a property which requires substantial expenditures to place it in properly habitable condition, and to make it attractive to the rental market. With the notable exception of Alabama, redemption statutes permit a foreclosure purchaser to receive from a redemptioner little more than the price bid at the foreclosure sale, so that a purchaser is well advised to keep rehabilitation expenses to an absolute minimum until the redemption period expires. As a practical matter, this delays the day when FHA, as such purchaser can safely embark on a program involving capital expenditures, thereby delaying the day when the property may be placed in condition for its best use and for advantageous sale which will reimburse the insurance fund for a portion of the loss incurred as a result of the mortgagor's default.' "

fully reimburse him for his outlays? In some states he cannot get possession. *E.g.*, California Code Civ.Proc. § 703, Mau, Sadler & Co. v. Kearney, 143 Cal. 506, 77 P. 411; Haynes v. Tredway, 133 Cal. 400, 65 P. 892. In some states if he does get possession and collects rents, they will be deducted from his reimbursement, *e.g.*, Idaho, Clark Investment Co. v. United States, *supra.* In some states, if he makes repairs, he will not be repaid for his outlays. These are precisely the problems which the federal government should not have to face. It is not in the real estate business. It should not have to hold and manage properties for any period longer than is absolutely necessary for it to get back its money. It should not be subjected to the risk that the property will deteriorate, and it should not be left with no means to protect itself against such losses.

Our doubts as to whether the statutes accomplish the purpose is reinforced by the fact that in many states, partly because of those statutes, real estate financing is almost exclusively secured by trust deeds with power of sale. This is certainly true in California, and the statutory right of redemption does not apply to such sales. Py v. Pleitner, 1945, 70 Cal.App.2d 576, 161 P.2d 393; Roberts v. True, 1908, 7 Cal.App. 379, 94 P. 392. See also, as to Idaho, n. 5, *supra.* One is tempted to inquire why, if public policy so strongly favors a post-sale period of redemption, the legislature has not applied it to sales under trust deeds? Perhaps it is because the redemption statute has, in some states, made the use of mortgages almost a dead letter.

Moreover, the policy of FHA is to bid the fair market value at the foreclosure sale. For this purpose, it has the property carefully appraised before bidding. See Book 2, Volume VII, Sec. 72926 of the FHA Manual. It is authorized by 12 U.S.C. § 1713(k) to "bid any sum up to but not in excess of the total unpaid indebtedness secured by the mortgage, plus taxes, insurance, foreclosure costs, fees, and other expenses * * *." It bids fair market value for its own protection as well as that of the mortgagor and other lienors. It is limited to the amount specified because the objective is to recover its loss on the mortgage insurance, not to put the government in the business of buying and speculating in real property. Presumably, if the property is worth more, others will increase the bid, the government will be paid in full, and the excess will go to junior lien holders and, if there be sufficient funds, to the mortgagor.

It is also suggested that a purpose of the redemption statutes is to protect junior lienors. Perhaps. But if the objective of the statutes is to obtain bids equal to market value, and if as is argued, the bidding would be lower in the absence of the statutes, then junior lienors could more easily protect themselves in the latter situation. They could buy the property at the sale for less. It is always open to the junior lienors to protect themselves by bidding. They take with notice of the senior lien. Here, the government's judgment was for $93,804.97; its bid was $55,100. The court found the value of the property to be $58,000. The deficiency judgment is for $37,728.88. This is a singularly inappropriate case in which to be concerned about junior lien holders. They simply have no equity in the property. There is no evidence that second mortgagees or contractors are less willing to extend credit on the security of junior liens in the states that have no redemption statutes than they are in the states that do, or in California when the first lien is almost always secured by a trust deed rather than by a mortgage.

Nor is it accurate to say that the application of state redemption rights does not tie up government funds; as this case illustrates, it does do so. Under 12 U.S.C. § 1743(c) the mortgagee has the option of assigning the mortgage to the Secretary and being paid the full amount of the guarantee, instead of itself foreclosing. As might be expected, that is what Prudential did in this case.

Why would any mortgagee do otherwise, when by so assigning it can receive the full benefit of the insurance without having to incur the expense and risk attendant upon foreclosure? Under the statute, Prudential received the full benefit of the insurance—government obligations equal to the then total value of the mortgage, in this case more than $90,000. If the redemption period applies, the government must wait a year to get its money back—and it may not then get it all, or even as much as it bid.

We conclude that the Idaho statute providing for right of redemption is not here applicable.

Finally, we note that the district court's decision did not purport to balance state and federal policies in allowing the period of redemption. Instead, it reasoned that Prudential (the original mortgagee) would have been subject to the redemption rights provided by state law, and that the United States could have no more rights than Prudential. Even assuming *arguendo* that Prudential would have been subject to state law, it does not follow that the federal government is limited to the remedies of the private mortgagee. *Cf.* Small Business Administration v. McClellan, 1960, 364 U.S. 446, 451–453, 81 S.Ct. 191, 5 L.Ed.2d 200; United States v. Summerlin, 1940, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283; United States v. Anderson, 5 Cir., 1964, 334 F.2d 111; Korman v. Federal Housing Administrator, D.C.Cir., 1940, 72 App.D.C. 245, 113 F.2d 743; Wagner v. McDonald, 8 Cir., 1938, 96 F.2d 273. In none of the federal mortgage cases cited in this opinion was it suggested that state law might control the rights of the United States because it was the assignee of a private insured lender.

That portion of the judgment providing for a right and period of redemption is reversed and the matter is remanded to the district court with directions to modify the judgment in a manner consistent with this opinion.

ELY, Circuit Judge (dissenting):

I respectfully dissent. The majority, with broad strokes, erases highly significant redemptive rights created by statute in the Territory of Guam and eight of the states comprising our Circuit as well as equitable rights of redemption hitherto applied by the courts of Hawaii. These rights are deeply rooted in history, founded on an equitable principle applied through centuries to protect the temporarily disadvantaged without working significant prejudice against his creditor. The approach which I take is made, not only in the interests of local mortgagors involved in the federal housing program, but also in the interests of the federal program itself. I do not dispute the fact that federal abrogation of state-created rights is often necessary for the protection of federal programs, but I have been unable to accept the majority's proposition that its dramatic result is here warranted by any overpowering motive of federal self defense. Time after time, the Congress of the United States has created programs through which private loans are guaranteed by the federal government. In not one of those programs has Congress ever prescribed that, in connection with those programs, state redemptive rights, either statutory or equitable, are eliminated. To me it is inconceivable that the members of Congress, when they enacted the many federal lending programs now extant, were either ignorant of, or blind to, the existence of state redemptive rights in foreclosure proceedings. When the Country's legislators have apparently deemed it unnecessary, in protecting the interests of the federal government, to strike down the states' rights in question, I think it presumptuous that a federal court should substitute its policy judgment to the contrary. My Brother Duniway's opinion, while written with his characteristic scholarship and technical precision, does not, insofar as I can see, demonstrate the existence of any controlling precedent requiring the conclusion which is reached. In this light, as well as in that of other considerations

which I shall discuss, I respectfully submit that the majority's opinion constitutes an unnecessary intrusion into the legitimate local affairs of nine western states, and of the Territory of Guam, and moreover, represents an unwarranted judicial usurpation of federal legislative power.

I can accept the assumption that federal law is controlling. United States v. View Crest Garden Apts., Inc., 268 F.2d 380 (9th Cir. 1959). But my proposition is that we should give effect to the pertinent and equitable state law by incorporating it into the federal program. The Supreme Court did exactly that with respect to a state coverture law in United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), and our court did the same with respect to a state "bulk sale" statute in Bumb v. United States, 276 F.2d 729 (9th Cir. 1960). The controlling criterion on the question is whether the state law can be given effect without either conflicting with federal policy or destroying needed uniformity in the pertinent federal law in its operation within the various states. United States v. Yazell, *supra* at 352, 86 S.Ct. 500. Thus, we should first reach an understanding of the purpose and effects of state redemption statutes.

The statutes can best be understood through a brief review of their historical development. The original method of mortgage foreclosure was known as strict foreclosure, a method whereby, on default, the mortgagee obtained a court decree awarding the mortgagor's interest in the security to the mortgagee. This offensive procedure was subject to severe defects, the most obvious of which was that the mortgagor faced the possibility of forfeiting all his equity in the property in the event that the property was worth more than the unpaid balance on the debt.

The harshness of strict foreclosure led to the concept of foreclosure by sale. Theoretically, the property was to be sold to the highest bidder with the mortgagee having first claim to the proceeds and the mortgagor obtaining his equity in the form of whatever surplus remained. This approach was expected to yield more even results by allowing the competitive market to set the value of the land instead of the "value" being set at the amount of the unpaid debt as was the fact under strict foreclosure. Unfortunately, this expectation was frustrated by reason of the immense advantages favoring the mortgagee at the sale. First, it was unnecessary for the mortgagee to raise and expend any cash up to the amount of the unpaid debt. Secondly, there would not often be an interested outside buyer, or junior lienholder with cash, at the precise time of the sale. Thus, the senior mortgagee was assured of being almost always the only bidder at the sale. The junior lienors, in particular, suffered under this method since their interests were cut off by the judicial sale. Since they had no weapons with which to force the sale price above the amount of the senior's claim, they often realized nothing on their claims.

The response of many jurisdictions to the unsatisfactory results of the foreclosure-by-sale procedure was the adoption of a statutory redemption period. The basic design of statutory redemption consists of giving the mortgagor and those claiming under him (including junior lienors) the right to redeem the property from the purchaser at the sale within a specified period by paying, *not* the balance of the debt secured, but the price paid at the sale. The objective of the redemption right is that the mortgagee or other bidders, if any, shall bid not less than the fair market value of the land, since otherwise the purchaser risks being divested of the land by redemption at less than its market value.

The key to understanding the statutory redemption right lies in the proposition that the statute's operation is in the nature of a threat. When redemption is exercised, it is thereby evidenced that the mortgagee has not bid adequately at the sale and the statute has not had its intended effect. On the other hand, if the

threat functions successfully and the mortgagee does bid adequately, then the mortgagor and junior lienors, if any, will have been satisfied to the full value of the property and there will be no reason for exercising the redemption right. If he bids the full market value of the property, then the mortgagee may rest secure in the knowledge that it will not be redeemed. *See generally* Durfee & Doddridge, Redemption From Foreclosure Sale, 23 Mich.L.Rev. 825, 827–834 (1925); Note, Redemption From Judicial Sales, 5 U.Chi.L.Rev. 625, 626 (1938).

With the foregoing as background, the relation of redemption statutes to the federal housing policies can be more clearly analyzed. The particular program involved here, War Housing Insurance, is only one of many administered under various Acts of Congress. This program, as the majority notes, is designed to stimulate housing for veterans; other programs are designed for rural housing, poverty relief, urban renewal, etc. All of the programs have as their basic goal the stimulation of construction by guaranteeing that lenders, contractors, and suppliers will not suffer losses on extending credit to builders and owners. Of course, some programs are more concerned with the owners and their need for housing than they are with the market for mortgages. This would be true, for instance, of a program designed to supply single-family housing while it would not be as crucial a consideration in the construction of multiple dwelling units. Thus, protection of the mortgagor's interests takes on greater or less significance depending on the type of program involved. It seems crystal clear to me, however, that the type of balancing involved in deciding what rights the mortgagor should have requires legislative attention to the entire scope of housing programs. I will deal with the Congress' role in this question later.

It seems no less clear to me that, disregarding the question of protection of the individual mortgagor, the goals of *any* federal housing program could not be served by the majority's decision. From the viewpoint of a mortgagor in a state with redemption provisions, and in the light of the majority's decision, it would be more desirable to finance privately than to finance through an FHA guaranteed mortgage. Even more important, potential junior lienors, such as contractors and suppliers, will be less willing to extend credit under these circumstances. Nor can junior lienors protect themselves, as the majority suggests, by bidding at the foreclosure sale. I have already explained that one reason for the existence of the redmption statutes is that the enormous leverage of the foreclosing mortgagee is not matched by junior lienors, who typically have very small cash reserves and never have the first "paid up" interest.

Thus one effect of the majority's decision will be to lower the attractiveness of FHA financing in states that have enacted redemption statutes. Other states have other methods of protecting both mortgagors and junior lienors that will not be matched in the redemption states.[1] Therefore, the uniformity among the states for which the Government argues cannot possibly be furthered by the majority's decision. Instead, uniformity would be furthered by conforming federal programs with state law.

The Government, and also the majority, make several arguments designed to show that redemption statutes are neither important nor necessary. The first is that the statutes do not work because no third party will bid at the sale, knowing that he will be subject to redemption. The statutes, as I have tried to explain, are not the least bit concerned with the actions of third parties since they were necessitated by the observa-

---

1. Some states provide for a statutory appraisal and prohibit foreclosure for less than a certain percentage of that value, while other states depend on anti-deficiency legislation and upset prices. *See* Jones, Mortgages § 1611(a).

tion that third parties do not ordinarily bid at foreclosure sales in any event. Instead of trying to stimulate bidding at the sale, they set up the more realistic possibility that the property will be redeemed if the mortgagee's bid is inadequate.

The majority also asserts that redemption rights are unimportant because most financing in modern times is accomplished through the use of trust deeds, which do not provide for redemption rights. There may be valid reasons for the distinction,[2] but we need not be concerned with them here. What is important is that the legislatures of the states have allocated certain rights to each method of financing with the result that a choice is available depending on the nature of the transaction and the needs of the parties. Once the parties have selected either method, they should accept all its consequences. Moreover, if redemption rights truly are of negligible importance, then it could be said that the Government has wasted much valuable time in pursuing a frivolous appeal!

The Government argues at one point that the policies of the redemption right are satisfied by the alleged practice of the FHA carefully to appraise the fair market value of the property and to make its bid accordingly at the foreclosure sale. It is interesting to note that the Government argues elsewhere that the effect of redemption statutes is to *depress* bidding at the sale. But it is even more interesting, and remarkable,

that a federal statute expressly prohibits the agency from bidding more than the unpaid balance on the debt! 12 U.S.C. § 1713(k), as incorporated by 12 U.S.C. § 1743(f).

Even if we assumed that the FHA contravened the prohibitory statute and was in some way bound to continue its asserted practice, such unilateral action of the FHA could not satisfy the premise of the redemption statutes. That premise is that the fair market value is realizable only through the interplay of competing economic forces. This premise is not satisfied by judicial sale because of the demonstrated falsity of the assumption, made by the majority, that a third party will come in to force the price up to market value at the sale. The fact that competing economic forces are necessary is amply shown in the case at bar, since the value of the land was set by the court according to the testimony of one Government witness. This value was less than one-half the original purchase price and far below the unpaid balance on the debt. The Government obtained a deficiency judgment for the difference between the set value and the unpaid debt. The Government then proceeded to buy in the property at the sale for an amount *less than the market value set by the court.*

Remaining unconvinced by the argument that the redemption statutes are unimportant and unnecessary, I can turn to other contentions made by the majority.[3] The first is that the Govern-

2. Originally, the distinction lay in the conceptualistic notion that the grantor conveyed all his interest through the trust deed, so that, unlike a mortgagor, he had nothing on which to base a right of redemption. More recently, the distinction has been based on such facts as that creditors cannot obtain deficiency judgments when property is sold under a trust deed and that notice requirements are more extensive under trust deeds. See, e. g., Comment, Comparison of California Mortgages, Trust Deeds and Land Sale Contracts, 7 U.C.L.A.L.Rev. 83, 88 (1959); Comment, Trust Deeds: Suit Upon Note Before Security Has Been Exhausted, 20 Calif.L.Rev. 318, 321 (1932).

3. One Government contention not passed upon by the majority is that the mortgagor waived all redemption rights "to the extent permitted by law." If what I have said of the policy of the statutes were accepted, then a purported waiver would necessarily be rejected as contrary to public policy. This is the result reached by many courts. See Elson Development Co. v. Arizona Savings and Loan Assn., 99 Ariz. 217, 407 P.2d 930 (1965); Beverly v. Davis, 79 Wash. 537, 140 P. 696 (1914). In addition, such a waiver is expressly prohibited by statute in some states. E. g., Cal.Civil Code § 2889. The reasons for this result are particularly compelling in the present situation be-

ment should not be required to maintain the premises during the redemption period. The majority asserts that the FHA does not have the manpower or the funds to place and keep the property in good repair, especially since the expense of improvements made by the purchaser-mortgagee is not recoverable as part of the redemption price. The first answer to this argument is that some redemption statutes specifically include the cost of upkeep and repair in the redemption price. *E.g.*, Cal.Code Civ. Proc. § 702. In addition, this is one element of redemption that could be molded to fit the Government's legitimate interests, as this court did in Clark Investment Co. v. United States, 364 F. 2d 7 (9th Cir. 1966).

I note with some incredulity that the majority cites *Clark Investment* for the proposition that Idaho law requires deduction of collected rents from the redemption price. In *Clark Investment,* this court held that the Idaho law could not be applied to the United States when property is redeemed from it. That decision itself clearly shows that the right of redemption can be maintained without any harm to the FHA because the courts can tailor certain elements of redemption to the benefit of the United States.

*Clark Investment* also demonstrates that the FHA is not necessarily confined to the same risks and burdens that other financers face. For example, during the redemption period, it can actually make a profit on the property with no more burden on its manpower than any other purchaser would have. Moreover, there is no reason why the Government should not accept a large share of the risks mentioned by the majority. The very purpose of the entire federal housing program is to provide badly needed housing that could not otherwise exist. I cannot imagine why the United States would venture into such a program if it were not willing to accept risks, possibly

even greater risks than would be accepted by the normal financing institution.

Nor am I persuaded that redemption periods inordinately tie up federal funds. Since the FHA is limited in its bid to the amount of the unpaid debt, it can expect to have property more valuable than that amount redeemed rather promptly. In the case of less valuable property, it will have to live with the fact that it is facing a loss, no matter what happens. One way in which this loss could be ameliorated would be to hold the property during the period of redemption, a period in which the agency can realize a valuable return on its money in the form of rents. If this is deemed to be too severe a burden upon the FHA, then the Congress is best equipped to recognize any such supposed burden and to relieve the agency from it.

Next, the Government argues, albeit weakly, that the issue is foreclosed by prior case law standing for the proposition that remedies under the federal housing programs must be uniform, without regard to the laws of the individual states. The cases cited by the Government do not support such a broad proposition. Principal reliance is on Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), and United States v. View Crest Garden Apartments, 268 F.2d 380 (9th Cir. 1959). *Clearfield Trust* dealt with the question of what law should be applied to the case of a forged endorsement on a United States check. There, the Court noted that a single piece of commercial paper issued by the United States may easily be involved in several transactions in different states. Therefore, the possible confusions and uncertainty required a uniform rule that could be constructed by the courts. Here, we have a single transaction within a single state and there can be no uncertainty or divergence of results if the state law is applied.

cause of the vastly unequal bargaining positions of the parties. It would indeed be a rare mortgagor who could effectively

bargain against the FHA for deletion of the waiver provision from the form contract.

*View Crest Garden Apartments* is much closer to the facts of this case, since it dealt with whether to apply state law in the appointment of a receiver after default on an FHA mortgage. The court relied principally on the distinction between the rights of the parties and the remedies available for the protection of those rights. After pointing out that Congress had adopted state laws for convenience in defining the rights of the parties, the court went on to note that after default the need for convenience had terminated and that the then paramount interest was furtherance of the policies of the act by attempting to insure certainty of return on the investment. In the opinion's bearing on our case, certain of its language is remarkably significant. That language is,

> "It is urged that to hold that federal law applie[d] would result in great hardship to mortgagors who would thereby be deprived of all rights under state law such as the right of redemption. We do not think that such a conclusion necessarily follows. A court confronted with that question could determine it by weighing the federal interest against the particular local policy involved. *If the considerations weighed by the court suggest an adoption of local law, such as the local rule on redemption, that could be done.*

*Id.* at 383 (emphasis added).

Although the court in *View Crest* evidently believed that redemption is more in the nature of a right than a remedy (or means of cutting off a remedy), I prefer not to rest on a conclusionary use of labels. Accepting the court's guidance that the involved interests should be weighed, I fail to see in what way the state interest conflicts with the true and most praiseworthy interests of the federal government. Certainly the minor inconveniences suffered by the FHA in managing the property is outweighed by the benefit to the national program in protecting the interests of contractors and suppliers. Therefore, we need not balance national interest against state interest but could simply give effect to all the policy considerations underlying both federal and state law.

Finally, I come to the Government's lame contention that the failure of Congress to provide for redemption rights is the equivalent of an express provision that state redemption laws should not be recognized. The logical absurdity of this argument is, of itself, sufficient to subvert the contention. But the abundant statutory and regulatory language apparently adopting state law in this context should not be overlooked. For example, the statutory definition of the rights of the United States itself provides that "the term 'first mortgage' means such classes of first liens as are commonly given to secure advances on, or the unpaid purchase price of, real estate, *under the laws of the State, in which the real estate is located,* * * *." 12 U.S.C. § 1707(a) (emphasis added). The regulations provide, "The mortgage must contain a provision or provisions, satisfactory to the Commissioner, giving to the mortgagee, in the event of default or foreclosure of the mortgage, such rights and remedies for the protection and preservation of the property covered by the mortgage and the income therefrom, *as are available under the law or custom of the jurisdiction."* 24 C.F.R. § 580.18 (1968) (emphasis added). Even the waiver in the present mortgage, on which the Government relied so strongly in the court below, provides that it is effective "to the extent permitted by law." Surely, we must presume that this language refers to the law of Idaho, for the federal law contains no such corresponding provisions to be waived or to which the waiver could be applicable.

At the very least, it seems unusual for the Government to argue that congressional silence can be equated with express abrogation of state-created rights. It is especially significant that, as we were informed on oral argument, the FHA has introduced several bills to achieve the result reached here, but Con-

gress has consistently refused to adopt this approach. The Supreme Court has stated on more than one occasion that rights should not be displaced or eliminated without the clearest legislative mandate. United States v. Shimer, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961); Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). I could not hold that silence on the part of Congress can be taken to effect an abrogation of time-honored state rights, derived from the most exalted principles of equity and so carefully designed, not only for the protection of debtors and creditors alike, but also for the promotion of the general economic welfare of the public at large.

I would affirm.