541 F.2d 777
 UNITED STATES of America, Plaintiff-Appellee,
v.
HADDON HACIENDAS COMPANY, a limited partnership, et al., Defendants,
Arnold G. Rudoff, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
HADDON HACIENDAS COMPANY, a limited partnership, et al., Defendants,
Alan M. Nahum, Defendant-Appellant.
 Nos. 74-1209, 74-1188.
 United States Court of Appeals,
Ninth Circuit.
 May 25, 1976.
 
 Lawrence M. Schulner and Harland W. Braun, Los Angeles, Cal., for defendants-appellants.
 Donald J. Merriman, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.
 Before WALLACE and KENNEDY, Circuit Judges, and FITZGERALD,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 The United States, on behalf of the Secretary of Housing and Urban Development, filed suit against Haddon Haciendas Company (Haddon), a limited partnership, to foreclose a note and deed of trust insured under the National Housing Act (NHA). The district court entered a judgment of foreclosure and order for sale in August 1971. In October 1971, the United States joined certain parties including appellants Rudoff and Nahum, general partners in Haddon, and added a claim for damages for waste and other violations of a regulatory agreement executed in conjunction with the deed of trust. After trial without a jury, judgment was entered for $16,000. Only Rudoff and Nahum appeal the judgment and we affirm.
 
 
 2
 Haddon acquired title to a housing project in Los Angeles County in November 1966. An outstanding note and deed of trust in favor of the Michigan Public School Employees' Retirement Board had been insured by the Federal Housing Administration (FHA) under section 221(d)(4) of the NHA, 12 U.S.C. § 1715l (d) (4). As a condition of federal insurance, the maker of the note had been required to execute a regulatory agreement in favor of the FHA. As part of the consideration for the purchase from the prior owner, Haddon agreed to assume and be bound by the note, deed of trust and regulatory agreement. Among the various obligations contained in the regulatory agreement, two are relevant to this action: the owners were to "maintain the project in good repair and condition," and books and accounts of operations were to be "kept in accordance with the requirements of the Commissioner." The agreement further required that a specified percentage of rents be set aside as a reserve for the purpose of "effecting replacement of structural elements, and mechanical equipment of the project or for any other purpose." Some $15,430 had accumulated in the reserve during Haddon's ownership of the project. This amount was subsequently applied to the outstanding balance on the note.
 
 
 3
 Haddon defaulted on the trust deed note by failing to make the monthly payment due in January 1969, and all subsequent payments, to the Michigan Public School Employees' Retirement Board. The FHA paid the note and received an assignment of the replacement fund, trust deed and note in May 1969. The court appointed a receiver who in operating the project accumulated a fund of $10,398 which was eventually turned over to the government and applied to the outstanding balance on the note. The government was granted foreclosure and purchased the property at a judicial sale, bidding $750,000 on a total outstanding debt of $992,027.
 
 
 4
 The government then amended its complaint to add as defendants Haddon's general partners and to seek damages for waste and for violations of the obligations specified in the regulatory agreement to maintain the premises and to keep satisfactory financial records. The district court found that Haddon and the general partners had failed to maintain the premises in good repair,[1] and had failed to maintain financial records in reasonable condition. He assigned as damages the $13,500 expended in restoring the property to "good repair and condition" and the $2,500 expended in reconstructing Haddon's books.
 
 
 5
 Rudoff and Nahum do not contest the findings that the regulatory agreement was breached. Rather, they contend that the terms of the deed of trust and the regulatory and assumption agreements prohibit assessment of money damages against them personally. They also argue that if damages can be assessed, the replacement reserve funds and the surplus operating funds accumulated by the court-appointed received should be an offset. We disagree.
 
 
 6
 In contending that money damages for disrepair may not be assessed against them personally, Rudoff and Nahum rely first on the terms of the deed of trust and the regulatory and assumption agreements. The regulatory agreement clearly imposes on Haddon's predecessor the obligations to maintain the premises in good repair and to keep satisfactory financial records. Haddon clearly agreed to assume these obligations in the assumption agreement. Rudoff and Nahum argue, however, that the regulatory agreement does not envisage an action for damages. The agreement provides that in case of its breach: (1) a default could be declared under the note and deed of trust, making the entire indebtedness due and payable and rendering the property subject to foreclosure; (2) the Federal Housing Commissioner (Commissioner) could collect the rents and apply them to Haddon's obligations; (3) the Commissioner could take possession of the project and operate it in accordance with the regulatory agreement; or (4) the Commissioner could sue for specific performance, for an injunction against violations, for appointment of a receiver, or for "such other relief as may be appropriate since the injury to the Commissioner arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain."
 
 
 7
 Although a party who proves the breach of a contractual duty is generally entitled to damages, 5 A. Corbin, Contracts § 1001 (1964), unless there is some contractual provision to the contrary, Rudoff and Nahum argue that by providing a comprehensive list of specific remedies the agreement implicitly prohibits a damage action. The agreement cannot be so interpreted. It is clear that the specific remedies are provided because damages are considered inadequate, not because they are prohibited. Here none of the specified remedies are available because the property has been sold and a damage action is the only remedy remaining.
 
 
 8
 Rudoff and Nahum next contend that even if money damages are allowed, they may not be assessed against them personally. The regulatory agreement provides that the individual partners in Haddon's predecessor are not personally liable for payments under the note or to the replacement reserve "or for matters not under their control" except that they are liable "for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof." The assumption agreement limits the liability of Haddon's general partners (including Rudoff and Nahum) in substantially identical terms. Rudoff and Nahum argue that the deterioration of the project was due to general neighborhood dilapidation and social conditions "not under their control." This argument is frivolous. The causes of the deterioration may have been beyond their control, but the decision whether or not to repair and maintain was clearly theirs.
 
 
 9
 Rudoff and Nahum also argue that they can be held liable only for affirmative acts in violation of the regulatory agreement and not for a failure to act. Again, they misread the agreement. The clause they refer to is not meant to distinguish between affirmative action and inaction; it merely exonerates the individual general partners from liability for the acts of others not authorized by them. The regulatory agreement imposed affirmative duties to maintain the premises in good repair and to keep satisfactory financial records. The district court found that the "defendants," i. e., Haddon and the general partners, violated those duties; the findings are not contested nor are they erroneous. That the various acts of neglect cited by the district court might be characterized as failures to act rather than affirmative misconduct is irrelevant. Nothing in the regulatory or assumption agreements exonerates Rudoff or Nahum from personal liability for violating the duties they assumed.
 
 
 10
 Further, we find this interpretation of the agreement consistent with the policy of the NHA.[2] The possibility of a post-foreclosure personal damage suit should motivate owners to maintain the premises and thereby serve the government's interests in providing habitable housing, preventing the spread of slums and protecting the public investment. The clause in the deed of trust prohibiting a deficiency judgment encourages private investment by reducing the owners' loss in case of failure; additional encouragement was not meant to be provided at the expense of the surrounding neighborhood and the project's tenants.
 
 
 11
 Rudoff and Nahum also rely on a provision in the deed of trust prohibiting the United States from seeking "any judgment for a deficiency in any action to foreclose this deed of trust." They note that the regulatory agreement is specifically incorporated into the deed of trust and argue that a post-foreclosure money judgment for breach of the regulatory agreement is tantamount to the deficiency judgment prohibited by the deed of trust.
 
 
 12
 In support of these contentions, they cite California cases decided under California's anti-deficiency legislation. In the most recent of these cases, Cornelison v. Kornbluth, 15 Cal.3d 590, 125 Cal.Rptr. 557, 542 P.2d 981 (1975), the California Supreme Court held that the policy behind California's anti-deficiency legislation requires that post-foreclosure waste actions be barred unless the plaintiff proves "bad faith" waste.
 
 
 13
 California statutes prohibit deficiency judgments in two situations: (1) following foreclosure and sale under a purchase money deed of trust or purchase money mortgage, Cal.Code Civ.Pro. § 580b; (2) following foreclosure by non-judicial sale, id. § 580d.
 
 
 14
 The purpose of 580b is to discourage vendors from overvaluing the security and, where inadequacy of the security results from a decline in property values during a general or local depression, to prevent the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability. Roseleaf Corp. v. Chierighino, 59 Cal.2d 35, 42, 27 Cal.Rptr. 873, 877, 378 P.2d 97, 101 (1963). The purpose of 580d is to put judicial enforcement on a parity with private enforcement: barring a deficiency judgment after a private sale encourages realistic credit bids in the same way that allowing redemption from judicial sales does. Id. at 43-44, 27 Cal.Rptr. at 878, 378 P.2d at 102.
 
 
 15
 The California Supreme Court's reasoning in Cornelison was that downturns in land values often force owners to defer maintenance in order to meet mortgage payments. To impose personal liability for waste resulting from such economic pressures would aggravate the downturn in the same way that allowing deficiency judgments would. Thus the court said that in cases where 580b or 580d would bar deficiency judgments, post-foreclosure waste actions can be maintained only for reckless, intentional or malicious despoliation of property. Cornelison v. Kornbluth, supra, 15 Cal.3d at 603-05, 125 Cal.Rptr. at 566-68, 542 P.2d at 990-92.
 
 
 16
 Since the district judge did not find that Rudoff and Nahum committed "bad faith" waste, they argue that no damages could be awarded under Cornelison. They claim the benefits of Cornelison in two ways. First they claim that even if 580b and 580d did not cover the facts of this case, the Cornelison rule should be adopted in construing the no-deficiency clause in the deed of trust. Second they claim that the California anti-deficiency statutes do cover the facts of this case and that Cornelison should be applied either of its own force or as an adopted federal rule.
 
 
 17
 The first argument is easily rejected. The California anti-deficiency legislation and the no-deficiency clause in the deed of trust for this federally-insured development do not serve identical purposes and thus different constructions are required. Both the legislation and the no-deficiency clause protect the mortgagor and thus encourage investment in housing. But the program of federally-insured loans under the NHA has other, more far-reaching objectives than merely protecting mortgagors. A no-deficiency clause in the deed of trust serves the additional NHA purposes of preserving the housing stock and preventing its deterioration into slums. In these respects, the NHA differs significantly from the California anti-deficiency legislation. Adoption of the Cornelison rule would undermine this objective and thus we decline to refer to it in construing the federal no-deficiency clause.
 
 
 18
 The second argument is more difficult. If California law is referred to not merely as an aid in construing similar language in a federal mortgage, but because it purports to cover the facts before us, we must decide whether the state law will be applied when the Commissioner forecloses a mortgage assigned to the federal government under a federal program of mortgage insurance.
 
 
 19
 The California anti-deficiency legislation may or may not cover the facts before us. Rudoff and Nahum argue that since they were not joined individually in the foreclosure action until after the sale was ordered, the foreclosure was non-judicial as to them and they can therefore claim the benefits of 580d. This contention raises a novel and difficult issue under California law.[3] Alternatively, the security interest here may be a purchase money deed of trust entitling them to the protections of 580b. This raises an issue of fact upon which the record is silent. While ordinarily Rudoff and Nahum would suffer the consequences of having failed to carry the affirmative burden to show that 580b covers this deed of trust, Cornelison was decided subsequent to the trial of this case and we might thus be inclined to remand for further proof. But we need not decide whether the California anti-deficiency legislation covers the facts of this case on either of these theories because we hold that even if it does, the Cornelison rule should not be applied in waste actions involving this type of security instrument.
 
 
 20
 While the present action arises under and is clearly determined by federal law, state law limiting the enforcement of a federal right is sometimes adopted as the federal rule. United States v. View Crest Garden Apartments, Inc., 268 F.2d 380, 382 (9th Cir.), cert. denied, 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959); see United States v. Yazell, 382 U.S. 341, 356-57, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966); Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Pa.L.Rev. 797, 799-803 (1957). The government responds that California law is not applicable in determining the government's remedies for enforcement of its security interests, citing our decision in United States v. Stadium Apartments, Inc., 425 F.2d 358 (9th Cir.), cert. denied, 400 U.S. 926, 91 S.Ct. 187, 27 L.Ed.2d 185 (1970). See Clark Investment Co. v. United States, 364 F.2d 7 (9th Cir. 1966).
 
 
 21
 Stadium Apartments held that federal law will not adopt state law granting a right of redemption after foreclosure of a mortgage guaranteed by the FHA. We quoted the statement in United States v. View Crest Garden Apartments, Inc., supra, 268 F.2d at 383, that:
 
 
 22
 (After foreclosure) the federal policy to protect the treasury and to promote the security of federal investment . . . becomes predominant. Local rules limiting the effectiveness of the remedies available to the United States for breach of a federal duty can not be adopted.
 
 
 23
 425 F.2d at 363 (footnote omitted).
 
 
 24
 Stadium Apartments would clearly prohibit our applying California law here were it not for a more recent en banc decision which rejected the broad View Crest dictum in holding that state laws limiting deficiency judgments and conferring redemption rights apply in foreclosure proceedings brought by the Small Business Administration. United States v. MacKenzie, 510 F.2d 39 (9th Cir. 1975) (en banc) (relying on United States v. Yazell, supra ); cf. United States v. Stewart, 523 F.2d 1070 (9th Cir. 1975). It is true that the majority in MacKenzie expressly declined to pass on the merits of Stadium Apartments. 510 F.2d at 42 & n. 4.[4] It is also true that MacKenzie and Stadium Apartments might be distinguishable in that they involve different government programs and agencies. Nevertheless, we are very hesitant to rest our decision solely on Stadium Apartments. Instead, we hold that allowing the government to bring a post-foreclosure damage action strikes a reasonable accommodation between competing federal anti-slum and California debtor-protection policies, in accordance with the teachings of MacKenzie.[5]
 
 
 25
 As in Yazell,[6] MacKenzie stressed the factual background of the Small Business Administration transactions involved in that case. Each of the loans was individually negotiated and hand-tailored for the specific individual involved. The implication was that the government had not bargained for pre-emption of state debtor-protection policies in the absence of pertinent legislation and regulations.
 
 
 26
 In United States v. Stewart, 523 F.2d 1070 (9th Cir. 1975), we applied California anti-deficiency legislation to bar an action by the Veterans Administration to recover on a loan where the facts fit snugly within the Yazell and MacKenzie analysis. The debtors in Stewart had signed an individually negotiated deed of trust which did not conform to the usual form utilized by the Veterans Administration. A paragraph declaring that federal law would govern the rights of the parties had been stricken and a paragraph providing for the application of California law in construing the instrument had been inserted. We considered these changes "crucial to the rights of the parties." 523 F.2d at 1072 n. 1.
 
 
 27
 In contrast, Rudoff and Nahum assumed a standard form regulatory agreement issued by the FHA without any pertinent modification. The opening proviso of the agreement stated that the following listed obligations of the owner were exacted "in order to comply with the requirements of the National Housing Act and the Regulations adopted by the Commissioner pursuant thereto . . . ."[7] The covenant to maintain the buildings, grounds and appurtenant equipment is required by 24 C.F.R. § 221.530(b) (Supp.1975), and the covenant to keep satisfactory financial records, by 24 C.F.R. § 221.530(d)-(e) (Supp.1975).
 
 
 28
 With this factual context in mind, we turn to the crucial issue of evaluating the federal and state policies at stake. Unlike Yazell, Stadium Apartments and MacKenzie, here the federal interest cannot be characterized simply as the protection of the public fisc.[8] Indeed, the no-deficiency clause allows owners to default and abandon a losing project without fear of a deficiency on the loan. The federal interest is rather of a more refined monetary nature. The purpose is to deter the exploitive management of federally-insured projects and the resulting substandard and slum-like housing conditions that the NHA was designed to eliminate. The federal housing program is not furthered by insuring investments in housing stock declining in standards of decency, safety and sanitation. Cf. McQueen v. Druker, 317 F.Supp. 1122, 1129-30 (D.Mass.1970), aff'd, 438 F.2d 781 (1st Cir. 1971).
 
 
 29
 In examining California's interest we need not question the efficacy of its anti-deficiency legislation as its redemption statute was questioned in Stadium Apartments. 425 F.2d at 365-66. A more appropriate threshold issue is to determine "whether the state law can be given effect without . . . conflicting with federal policy . . . ." United States v. Stadium Apartments, Inc., supra, 425 F.2d at 368 (Ely, J., dissenting). Here, adoption of California law on waste actions would remove a powerful incentive for landlords to maintain housing projects in decent condition. Under-maintenance is a common practice for profiteers in the FHA housing field since artificial profits can be gained during the interim period between the point at which normal maintenance ceases and the time at which the consequent quality decline becomes apparent to the market and the Commissioner. See Lowry, Filtering and Housing Standards, 36 Land.Econ. 362 (1960), excerpted in G. Lefcoe, Land Finance Law 199, 204 (1969). To the extent that Cornelison would bar a post-foreclosure action for damages for failure to keep adequate books, adoption of the California rule would remove an incentive for landlords to comply with this requirement and hamper detection of exploitation and fraud.
 
 
 30
 Although Rudoff and Nahum argue that they are not profiteers and have not personally withdrawn any funds from the project, exoneration is still inconsistent with federal policy. The spread of blight is not checked by encouraging owners of failing projects to keep up mortgage payments as long as possible by ceasing required maintenance. Indeed, as this case demonstrates, blight and dilapidation are thereby spread.
 
 
 31
 Our holding that post-foreclosure damage actions may be maintained is not unduly intrusive upon California's debtor-protection scheme. In the purchase money mortgage situation, California seeks by section 580b to discourage vendors from overvaluing the security by prohibiting deficiency judgments. But when FHA insurance is sought for such a mortgage, there is federal protection against vendor overvaluation: the property is carefully analyzed and the insurance is not forthcoming unless the security is judged adequate. 24 C.F.R. § 221.509 (Supp.1975). Where the security is undervalued due to local or general depression, California protects defaulting owners from deficiency judgments in order to avoid aggravating the economic downturn. But the FHA mortgage or deed of trust also prohibits a deficiency judgment. In this context, a damage action is not necessarily as burdensome. Here, for example, the damages are $16,000 compared to the deficiency on the note of over $242,000. The aggravation of the downturn caused by such judgments is probably no worse than the deleterious influence on the neighborhood of the deterioration which such judgments are designed to prevent.
 
 
 32
 In the non-judicial sale situation, California seeks by section 580d to put such sales on a parity with judicial foreclosures: the ban on deficiencies after private sales serves the same protective function as the right to redeem from judicial sales. But since there is no right to redeem after an FHA foreclosure, United States v. Stadium Apartments, Inc., supra, and since the form mortgage prohibits a deficiency judgment under any circumstances, the premises upon which the statute is based are not valid in the FHA foreclosure context. To the extent that parity remains the goal of the statute in these circumstances, that goal is served by permitting damage actions after private sales just as after foreclosure of purchase money mortgages.
 
 
 33
 In sum, permitting post-foreclosure damage actions should not discourage sound investors from participating in section 221(d)(4) projects. It should only discourage them from hanging onto projects after losing the ability to maintain them. If the empirical data does not bear this out, this issue of housing economics should be addressed to the executive branch and Congress, not to the courts. To hold otherwise would serve only to encourage short-swing profiteering at the expense of the public investment by owners failing to deduct sums appropriate for capital improvement from rents.[9]
 
 
 34
 The last contention of Rudoff and Nahum is that the replacement reserve funds and the surplus operating funds accumulated by the court-appointed receiver should be offset against the award of damages. These funds were turned over to the Commissioner and applied to the balance due on the debt.
 
 
 35
 The regulatory agreement requires the replacement reserve to be "under the control of the Mortgagee" at all times. While it allows the mortgagee to make disbursements for replacement of structural elements and mechanical equipment, it also authorizes the Commissioner, upon default, to apply the fund to the amount due on the mortgage debt. The Commissioner was not obligated to use these funds for repair of the premises. See United States v. Queen's Court Apartments, Inc., 296 F.2d 534, 536 n. 2, 538 (9th Cir. 1961).
 
 
 36
 Nor are Rudoff and Nahum entitled to offset the surplus funds generated during receivership against the damages. The assignment of rents as security for the obligations specified in the regulatory agreement was expressly made subject to the assignment of rents in the deed of trust to secure payments on the note. The funds accumulated by the receiver in operating the project were therefore properly applied to the balance due on the note; nothing remained to reduce the liability for breach of the regulatory agreement.
 
 
 37
 AFFIRMED.
 
 
 
 *
 Honorable James M. Fitzgerald, United States District Judge, District of Alaska, sitting by designation
 
 
 [1]
 The district judge found:
 Among other things, defendants permitted the landscape to become grossly overgrown and strewn with trash and debris, and allowed trees to remain uprooted and overturned; and they failed and neglected to repair or replace, as appropriate, draperies, window screens, locks, mailboxes, air conditioners, refrigerators, and stoves; in addition thereto defendants failed and neglected to maintain a part of the sanitary sewer system open and free-flowing, and to accomplish other miscellaneous repairs of a substantial nature.
 
 
 [2]
 Section 221(d)(4) of the NHA, the provision pursuant to which this mortgage was insured, was added by the Housing Act of 1954, ch. 649, Title I, § 123, 68 Stat. 599. Among the general purposes of the bill were "(attacking) our slums in the cities and towns of our Nation, and (providing) an organized and intelligent method of preventing the spread of blight and slums." S.Rep.No.1472, 83d Cong., 2d Sess. 2 (1954), reprinted in 1954 U.S.Code Cong. & Ad.News pp. 2723, 2724. Section 221 was specifically added to encourage private financing of housing for low and middle income families displaced by governmental slum clearance and urban renewal. Id. at 25-26, 1954 U.S.Code Cong. & Ad.News at pp. 2747-48
 
 
 [3]
 In California, a partnership may be sued in its own name but a judgment is binding on the partners only if specifically named in the complaint and personally served. Fazzi v. Peters, 68 Cal.2d 590, 68 Cal.Rptr. 170, 440 P.2d 242 (1968). We have found no California cases, however, to support or refute the contention that failure to join the general partners in a foreclosure action renders the sale "non-judicial as to them."
 
 
 [4]
 Two judges were of the opinion that MacKenzie and Stadium Apartments are irreconcilable and that the latter should be overruled. 510 F.2d at 43 (Ely, J., concurring)
 
 
 [5]
 Our result would also comport with the competing test articulated in the dissent in Stadium Apartments: "The controlling criterion on the question is whether the state law can be given effect without either conflicting with federal policy or destroying needed uniformity . . . ." 425 F.2d at 368 (Ely, J., dissenting)
 
 
 [6]
 382 U.S. at 345-47, 353, 86 S.Ct. 500. In Yazell, the Court held that the SBA could not override the Texas defense of coverture, an archaic doctrine imposing a disability on a married woman's competency to contract, in order to collect a deficiency judgment on a disaster loan
 
 
 [7]
 The assumption agreement reaffirmed the proviso of the regulatory agreement in nearly identical language
 
 
 [8]
 Bald assertions of a public fisc interest have not met with favor. See, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (public fisc interest not compelling enough to justify residency requirements for welfare aid); United States v. Yazell, supra, 382 U.S. at 348-49, 86 S.Ct. 500
 
 
 [9]
 We also reject the contention that the damage action is barred by California's one form of action rule:
 There can be but one form of action for the recovery of any debt, or the enforcement of any right secured by mortgage upon real or personal property, which action must be in accordance with the provisions of this chapter (i. e., foreclosure).
 Cal.Code Civ.Pro. § 726 (West 1955). This statute has been interpreted to mean that a lender with multiple security loses his rights to unforeclosed security by bringing an action against part but not all of the security. Walker v. Community Bank, 10 Cal.3d 729, 111 Cal.Rptr. 897, 518 P.2d 329 (1974). But the statute does not prohibit actions for damages for something other than enforcement of the debt. J. Hetland, California Real Estate Secured Transactions 239 (1970). Thus we need not decide whether the California rule is applicable in a case such as this.