**UNITED STATES of America,
Plaintiff,**

v.

**Charles H. HARVEY, Defendant.**

**No. IP 96–0554–C–T/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 12, 1998.

Marsha C. Massey, Assistant United States Attorney, Indianapolis, IN, Tim A. Baker, Assistant U.S. Attorney, Office of the United States Attorney, Indianapolis, IN, for United States of America.

Irving Fink, Yosha Ladendorf Krahulik & Weddle, Indianapolis, IN, for Charles H. Harvey, Rockwood Partnership, Wyckford Associates, Calvin A. Wantland, Jr.

Charles V. Traylor, Brattain & Minnix, Indianapolis, IN, Robert A. Rose, Dan Pecar Newman & Kleiman, Indianapolis, IN,

for Sam G. Craig, II, Donald L. Goggins, James G. Goggins.

Irving Fink, Yosha Ladendorf Krahulik & Weddle, Indianapolis, IN, Thomas C. Scherer, Bingham Summers Welsh & Spilman, Indianapolis, IN, for Deci–Ma Management Corp.

## ENTRY FOLLOWING BENCH TRIAL

TINDER, District Judge.

This action arises out of a Regulatory Agreement for Insured Multi–Small Family Housing Projects dated August 20, 1980 between the Secretary of the Department of Housing and Urban Development ("HUD") and Woodbrook Associates, a limited partnership, pertaining to a multi-family housing development located at 5302 Woodbrook Drive, Indianapolis, Indiana. On October 6, 1997, a bench trial was held and evidence presented by both parties was heard. After a review of that evidence and the law governing this case, the court now issues the following as Findings of Fact and Conclusions of Law pursuant to Fed.R.Evid. 52(a).[1]

### Findings of Fact

1. Woodbrook Associates is an Indiana real estate limited partnership whose sole asset is the Woodbrook Apartments constructed in 1980 in Indianapolis. (Stipulations of the Parties ("Stip.") ¶ 1).

2. At all times relevant to this suit, the general partners of Woodbrook Associates were: Charles H. Harvey ("Harvey"); Sam G. Craig, II; Donald L. Goggins; and James G. Goggins (collectively referred to as "Woodbrook Associates"). (Stip.¶ 2).

3. Woodbrook Associates was formed under the Uniform Limited Partnership Act of the State of Indiana on July 2, 1980. (Stip.¶ 3).

4. The Woodbrook Apartments project was primarily funded by a first mortgage loan of $5,559,700, at 7.5%, insured by the United States Department of Housing and Urban Development ("HUD"). (Stip.¶ 4).

5. On August 20, 1980, Harvey, as general partner for Woodbrook Associates, and HUD entered into a Regulatory Agreement for Insured Multi–Family Housing Projects ("the Regulatory Agreement") covering the project known as Woodbrook Apartments in consideration for the Secretary's guarantee of the construction loan and a permanent loan for Woodbrook Associates. Harvey also executed a mortgage and mortgage note dated August 18, 1980 as general partner for Woodbrook Associates. (Stip. ¶ 5, Pl.'s Ex. 2).

6. In December, 1985, Woodbrook Associates entered into a contract with Deci–Ma Management Corporation ("Deci–Ma Management") appointing Deci–Ma Management as Woodbrook Associates' exclusive agent for the management of the Woodbrook Apartments. (Stip.¶ 6).

7. In 1987, Woodbrook Associates defaulted on the mortgage. (Stip.¶ 7).

8. Paragraph 8(b) of the Regulatory Agreement restricts the circumstances under which Woodbrook Associates can make payments or distributions of the assets or income of Woodbrook Apartments. Specifically, the Secretary's prior written approval is necessary before Woodbrook Associates can pay out any assets or income of Woodbrook Apartments other than "surplus cash, except for reasonable operating expenses and necessary repairs." (Stip. ¶ 8, Pl.'s Ex. 2 ¶ 8(b)).

9. In addition, Paragraph 8(e) of the Regulatory Agreement provides that Woodbrook Associates cannot, without the prior written approval of the Secretary, "[m]ake, or receive and retain, any distribution of assets or any income of any kind of [Woodbrook Apartments] except surplus cash," and then only under the conditions specified in the Regulatory Agreement. (Stip. ¶ 9, Pl.'s Ex. 2 ¶ 8(e)).

---

1. Should any of the findings of fact be more appropriately called conclusions of law, or vice versa, then they should be considered by the reader to support the result reached in this entry regardless of how such findings or conclusions are labeled.

10. Paragraph 16(f) of the Regulatory Agreement states that "surplus cash" cannot exist when, among other things, Woodbrook Associates has not paid all sums due or currently required to be paid on the mortgage debt owed to the Secretary. (Stip. ¶ 10, Pl.'s Ex. 2 ¶ 16(f)).

11. Once Woodbrook Associates defaulted on the mortgage, Woodbrook Associates could only pay out assets or income of Woodbrook Apartments for reasonable operating expenses and necessary repairs. The distribution of assets for any other purpose could only be made with HUD's prior approval. (Stip.¶ 11).

12. In January of 1990, Harvey became actively involved in the management of Woodbrook Apartments. (Stip.¶ 12).

### Payments to Rockwood Partnership and Wyckford Associates

13. According to monthly reports submitted to HUD on behalf of Woodbrook Associates, on April 29, 1988, Woodbrook Associates used assets and income of Woodbrook Apartments to pay Rockwood Partnership ("Rockwood") $3,825.00. Woodbrook Associates did not seek approval from HUD prior to making this payment. (Stip.¶ 13). The evidence at trial established that either Mr. Harvey authorized that this payment be made or that Deci–Ma Management as agent for Woodbrook Associates made this payment. (Tr. at 96–97).

14. According to monthly reports submitted to HUD on behalf of Woodbrook Associates, on December 14, 1988, Woodbrook Associates used assets and income of Woodbrook Apartments to pay Wyckford Associates ("Wyckford") $3,000.00. Woodbrook Associates did not seek approval from HUD prior to making this payment. (Stip.¶ 14). The evidence at trial established that either Mr. Harvey authorized that this payment be made or that Deci–Ma Management as agent for Woodbrook Associates made this payment.

15. HUD was unable to discern that the payments to Rockwood and Wyckford involved the repayment of owner advances until it received an audit of 1988 financial statements from Woodbrook Associates on or about August 18, 1992 ("the 1988 audit"). Accordingly, HUD did not question these payments until after it received the audit. (Tr. at 21–23).

16. In the "Notes to the Financial Statements" attached to the 1988 audit ("the 1988 audit notes") it was disclosed to HUD for the first time that "[a] general partner of Woodbrook Associates is a partner in a real estate entity known as Rockwood Partnership. Rockwood ... was repaid all advances of $3,825 during 1988." (Pl.'s Ex. 9 at 13).

17. Additionally, the audit notes disclosed to HUD for the first time that "[a] general partner of Woodbrook Associates is a partner in a real estate entity known as Wyckford Associates. Wyckford Associates advanced $3,000 to Woodbrook Associates during 1986, which was repaid during 1988." (Id.).

18. When surplus cash does not exist, the repayment of owner advances is prohibited unless prior approval from HUD has been obtained. (Pl.'s Ex. 1a).

### Payments to Chateau

19. According to monthly reports submitted to HUD on behalf of Woodbrook Associates, from December 5, 1990 to May 1, 1995, Woodbrook Associates used assets and income of Woodbrook Apartments to pay Chateau, Inc. a total of $24,810.00. Woodbrook Associates did not seek approval from HUD prior to making these payments. (Stip.¶ 16). The testimony of Barbara Reed, bookkeeper for Deci–Ma Management, and the testimony of Charles Harvey demonstrates that Harvey directed that these payments be made. (Tr. at 57, 65, 101).

20. The total payment to Chateau breaks down as follows:

| Date of Payment | Payment Purpose | Amount of Payment |
| --- | --- | --- |
| 12/5/90 | Market study & site preparation | $ 935.00 |
| 4/16/91 | 1st quarter intensive market study | 1,000.00 |

| Date of Payment | Payment Purpose | Amount of Payment |
|---|---|---|
| 5/2/91 | 2nd quarter intensive market study | 1,000.00 |
| 7/8/91 | Intensive market study | 1,000.00 |
| 9/19/91 | Intensive market study | 1,050.00 |
| 12/9/91 | Market study | 1,000.00 |
| 4/1/92 | Market study | 1,000.00 |
| 6/2/92 | Market study | 1,000.00 |
| 10/1/92 | Quarterly market study | 1,000.00 |
| 12/2/92 | Quarterly market study | 1,000.00 |
| 1/4/93 | Market study | 1,000.00 |
| 4/1/93 | Quarterly market study | 1,000.00 |
| 6/3/93 | Quarterly market study | 1,000.00 |
| 8/2/93 | Quarterly market study | 1,000.00 |
| 12/8/93 | Market study | 1,000.00 |
| 3/2/94 | Market study | 1,200.00 |
| 5/2/94 | Quarterly market study | 1,200.00 |
| 8/11/94 | Market study | 1,200.00 |
| 8/19/94 | Partial payment employee search | 1,312.50 |
| 9/1/94 | Personnel research | 1,312.50 |
| 12/1/94 | Market study | 1,200.00 |
| 2/2/95 | Market study | 1,200.00 |
| 5/1/95 | Market study | 1,200.00 |

21. Chateau, Inc. is owned by Patricia Harvey, wife of defendant, Charles Harvey. (Stip.¶ 17).

22. HUD Handbook 4381.5 at section 2–14, A(6) states that "The management fee must pay for salaries, fringe benefits, office expenses, fees and contract costs incurred in analyzing and solving project problems." (Pl.'s Ex. 1b).

23. The market studies performed by Chateau, Inc. are costs to "solve project problems" which should have been borne by the management company. (Tr. at 25.)

24. The books and accounts of Woodbrook Associates do not establish that the payments to Chateau, Inc., were for reasonable operating expenses or necessary repairs of the project. In fact, the 1992 audit notes reflect that the market studies were "non-operating" expenses. (Pl.'s Ex. 11 at 12).

25. Mr. Burch testified that he was aware of no other HUD insured or mortgaged property which has utilized third party market studies and paid for the costs of those studies with project assets or income. (Tr. at 26–27).

### Bankruptcy-related Payments

26. On August 21, 1990, Woodbrook Associates filed for protection under Chapter 11 of the Bankruptcy Code. (Stip.¶ 18).

27. According to monthly reports and yearly audits submitted to HUD on behalf of Woodbrook Associates, between August 8, 1990, and April 25, 1996, Woodbrook Associates used assets and income of Woodbrook Apartments to pay a total of $39,456.00 for bankruptcy-related expenses. Woodbrook Associates did not seek approval from HUD prior to making these payments. (Stip.¶ 19). Mr. Harvey testified at trial that he directed that the bankruptcy be filed "to protect the partnership." Mr. Harvey also admitted that he directed that the bankruptcy-related payments detailed in paragraph 29 be made with project funds. (Tr. at 61–63).

28. The total payment for bankruptcy-related expenses breaks down as follows:

| Date of Payment | Payment Purpose | Amount of Payment |
|---|---|---|
| 8/8/90 | Consulting fee for Stephen P. Priddy | $ 5,000.00 |
| 8/8/90 | Bamberger & Feibleman legal legal retainer | 20,000.00 |
| 8/9/90 | Appraisal fee for Robert DeWitt | 1,500.00 |
| 10/17/90 | U.S. Trustee quarterly fee | 300.00 |
| 1/15/91 | U.S. Trustee quarterly fee | 300.00 |
| 5/18/91 | U.S. Trustee quarterly fee | 750.00 |
| 8/30/91 | U.S. Trustee quarterly fee | 750.00 |
| 10/18/91 | U.S. Trustee quarterly fee | 750.00 |
| 8/1/95 | Balance 2nd. quarter U.S. Trustee fee | 750.00 |

| Date of Payment | Payment Purpose | Amount of Payment |
|---|---|---|
| 10/24/95 | 3rd quarter U.S. Trustee fee fee | 1,250.00 |
| 2/1/96 | U.S. Trustee quarterly fee | 1,250.00 |
| 4/25/96 | U.S. Trustee quarterly fee | 1,250.00 |
| Date not provided in 1992 Audit submitted by Woodbrook Assoc. | Partnership legal fees | 5,606.00 |

(Stip.¶ 20).

29. HUD has never considered the payment of bankruptcy-related expenses to be necessary and reasonable operating expenses of a HUD financed or insured property as defined in paragraph d in the Audit Guide for HUD Multi–Family Properties, IG 4372.1 CHG–1. (Tr. at 17–18). Rather, the trustee fees are expenses of the property owner.

30. The books and accounts of Woodbrook Associates do not establish that the payments for bankruptcy-related expenses were for reasonable operating expenses or necessary repairs of the project. (Tr. at 28–31; Pl.'s Ex. 11 & 20).

31. At the outset of the bankruptcy proceedings of Woodbrook Associates, HUD objected to Woodbrook Associates' use of the income of Woodbrook Apartments, even in the ordinary course of business, unless HUD gave its permission or the bankruptcy court authorized the use of the funds. (Pl.'s Ex. 15, *In re Woodbrook Assoc.*, Mot. to Prohibit the Use of Cash Collateral Without Adequate Protection and accompanying Mem. dated October 25, 1990).

32. Although the bankruptcy court never specifically ruled on HUD's Motion to Prohibit the Use of Cash Collateral Without Adequate Protection, it did dismiss the bankruptcy on HUD's motion. In its conclusions of law, the Bankruptcy Court noted, "the plan is not feasible as it relies upon the use of funds upon which HUD has a lien, and which use HUD has not consented to." (Pl.'s Ex. 16, Findings of Fact, Conclusions of Law, and Entry of Dismissal at 3, ¶ 2). This dismissal was upheld on appeal by the District Court and the Seventh Circuit Court of Appeals. *See In re Woodbrook Associates*, 19 F.3d 312 (7th Cir.1994).

33. Woodbrook Associates filed a Second Amended Plan of Reorganization ("the Second Amended Plan") on July 27, 1995.

34. In its Opinion denying confirmation of the Second Amended Plan, the Bankruptcy Court noted, "Acceptance of the restrictions set forth in the Regulatory Agreement on the use of project income was a precondition to receiving the financing for the construction of the project. DIP [Debtor in possession—Woodbrook Associates] may not, through the filing of a bankruptcy petition, lift those restrictions and prohibitions (citation omitted)." (Pl.'s Ex. 17, Order and Opinion dated March 14, 1996 at 6).

35. Moreover, in September 1992, HUD Handbook 4350.1, REV–1 at section 10–17 was modified to state, "project funds may not be used to defend a foreclosure action or to pay for a bankruptcy action." (Pl's Ex. 1c at section 10–17).

36. Sam Burch testified that HUD does not consider this modification to be a new rule regarding the use of project assets and income. Had Woodbrook Associates sought prior approval for its payments for bankruptcy-related expenses, HUD would have advised Woodbrook Associates that the payment of trustee fees from project funds would be prohibited. (Tr. at 18).

### General Partner Travel Expenses

37. According to monthly reports submitted to HUD on behalf of Woodbrook Associates, between September 21, 1990, and June 8, 1992, Woodbrook Associates used assets and income of Woodbrook Apartments to pay a total of $3,887.00 in travel expenses for Charles Harvey. Woodbrook Associates did not seek approval from HUD prior to paying these expenses. (Stip.¶ 21). Barbara Reed and Charles Harvey testified that Mr. Harvey

directed that these expenses be paid with project funds. (Tr. 58, 65).

38. The total payment for general partner travel expenses breaks down as follows:

| Date of Payment | Payment Purpose | Payment Amount |
|---|---|---|
| 9/21/90 | Travel expense for Charles Harvey | $567.00 |
| 4/16/91 | Travel expense for Charles Harvey | 579.00 |
| 5/2/91 | Travel expense for Charles Harvey | 655.00 |
| 6/18/91 | Travel expense for Charles Harvey | 523.00 |
| 8/16/91 | Travel expense for Charles Harvey | 573.00 |
| 11/19/91 | Travel expense for Charles Harvey | 550.00 |
| 6/8/92 | Airfare for Charles Harvey | 440.00 |

(Stip.¶ 22).

39. According to HUD Handbook 4381.5, "Asset management includes: ... (2) periodic owner visits to the project to review the agent's performance.... (B) Asset management costs must NOT be billed against the project account. These costs may be paid only from amounts available for distribution to owners, in accordance with the terms of the Regulatory Agreement and HUD Handbook 4670.2." (Pl.'s Ex. 1b at section 2–16(A) and (B) (emphasis in original)).

40. The books and accounts of Woodbrook Associates do not establish that the payment of general partner travel expenses constitutes a reasonable operating expense or necessary repair of the project.

*Payment for Secretarial Services*

41. According to the 1992 audit submitted to HUD on behalf of Woodbrook Associates, during the 1992 year Woodbrook Associates used assets and income of Woodbrook apartments to pay secretarial fees of $2,284.00. Woodbrook Associates did not seek approval from HUD prior to paying these fees. (Stip.¶ 23).

42. HUD Handbook regulation 4381.5 at section 2–14(A) provides that the management fee must pay for salaries, fringe benefits, and office expenses. (Pl.'s Ex. 1b at section 2–14).

43. Woodbrook's 1992 Audit notes reflect that the secretarial services were for "non-operating" expenses of the partnership. (Pl.'s Ex. 11 at 12).

44. HUD considers the secretarial services to be office expenses which should be borne by either the management company or the partnership. (Tr. at 31).

45. The books and accounts of Woodbrook Associates do not establish that the payments for secretarial services constitute reasonable operating expenses or necessary repairs of the project. (Pl.'s Ex. 1 at 12; Tr. at 31).

### Conclusions of Law

1. Per statute, the Secretary of HUD may request the Attorney General to bring an action in a United States district court to recover any assets or income used by any person in violation of (A) a regulatory agreement that applies to a multifamily project ... or (B) any applicable regulation. For purposes of this section, a use of assets or income in violation of the regulatory agreement or any applicable regulation shall include any use for which the documentation in the books and accounts does not establish that the use was made for a reasonable operating expense or necessary repair of the project....

12 U.S.C. § 1715z–4a(a)(1). If a violation of the statute is shown, the United States may recover double damages and all costs relating to the action, including reasonable attorney fees. 12 U.S.C. § 1715z–4a(c). The statute also states that "[t]he remedy provided by this section is in addition to any other remedies available to the Secretary or the United States." 12 U.S.C. § 1715z–4a(e).

2. The language of the statute does not require that the United States prove damages in order to recover double the amount paid out in violation of the Regulatory Agreement and costs. Even if the statute did require that damage be

shown, damage can be presumed when the disputed payments are made in violation of the Regulatory Agreement and in contravention of the goals of the National Housing Act. *See e.g. United States v. Haddon Haciendas Co.*, 541 F.2d 777, 784 (9th Cir.1976).

3. In passing 12 U.S.C. § 1715z–4a, Congress sought to stress that Regulatory Agreements are a fundamental and essential component of the Federal financing scheme for multifamily housing projects under the National Housing Act. *See, e.g.,* 12 U.S.C. § 1713(b)(2); 24 C.F.R. § 207.18(c). Under the Federal financing scheme, HUD agrees to exculpate mortgagors from personal liability for repayment of the mortgage, in return for the mortgagors' agreement to operate the multifamily project in accordance with the terms and conditions of the Regulatory Agreement. These terms restrict the owners' use of project funds. As one court observed in reference to a HUD Regulatory Agreement, "[t]he restrictions on the use of project income were part and parcel of the financing for the acquisition of the apartments, particularly in light of the waiver of personal liability." *In Re EES Lambert Assoc.*, 43 B.R. 689, 691 (Bankr.N.D.Ill. 1984), *aff'd*, 63 B.R. 174 (N.D.Ill.1986) [hereinafter *"Lambert I"* and *"Lambert II,"* respectively]. Commercial developers, such as Harvey, presumably possess the resources and sophistication to make agreements they will be able to live with. *United States v. Winthrop Towers*, 628 F.2d 1028, 1036 (7th Cir.1980). Accordingly, the importance HUD attaches to the project's ironclad observance of the terms of the Regulatory Agreement cannot be contested.

4. In HUD's Audit Guide for Multi-Family Properties, the agency notes that while "[t]here are no precise definitions of expenses necessary and reasonable to the operation and maintenance of the project," the agency explicitly provides examples of the types of expenditures which would not meet that definition. Those expenditures include legal expenses incurred in the sale of partnership interests, fees for the preparation of tax returns, the payment for advice to owners regarding the tax consequences of foreclosure, or the reimbursement to owners of prior advances. (Trial Exhibit 1a, Audit Guide for HUD Multifamily Properties, IG 4372.1 CHG–1(d) (1979)).

■ 5. In addition, many courts have addressed the definition of "reasonable operating expenses and necessary repairs" in the context of a HUD regulatory agreement. In *Thompson v. United States*, 408 F.2d 1075 (8th Cir.1969), the court found that:

> Regard must be had to the context in which the term is used and to the nature of the business under consideration. In the present context the Court is convinced that the term must be construed with at least reasonable strictness and the concept of 'operating expenses' should be limited to expenses paid or incurred in connection with the actual operation of the [project] as a going concern.

*Thompson*, 408 F.2d at 1080 (citing *United States v. Thompson*, 272 F.Supp. 774, 787 (E.D.Ark.1967)). *Accord United States v. Frank*, 587 F.2d 924, 927 (8th Cir.1978); *United States v. Berk & Berk*, 767 F.Supp. 593, 598 (D.N.J.1991); *In re Tampa Bay Briarwood Assoc. Ltd.*, 118 B.R. 126, 127–28 (Bankr.M.D.Fla.1990); *In re Garden Manor Assoc.* 70 B.R. 477, 481 (Bankr. N.D.Cal.1987).

6. In another case construing a HUD regulatory agreement, the court characterized reasonable and necessary operating expenses as those " 'arising from the everyday operation and maintenance of the project.' … It rightly distinguishes payments made for the investors' benefit from those made for the benefit of the project." *Lambert II*, 63 B.R. 174 at 176 (citations omitted). *Accord In re RLA of Madison, Inc.*, 177 B.R. 78, 80 (Bankr.M.D.Tenn. 1994). Basically, the definition recognizes that the "National Housing Act was primarily intended to benefit individuals who live in inadequate housing, not commercial

developers." *Winthrop Towers*, 628 F.2d at 1036 (citing *M.B. Guran Co., Inc. v. City of Akron*, 546 F.2d 201, 204 (6th Cir.1976) and *Cedar–Riverside Assoc., Inc. v. City of Minneapolis*, 606 F.2d 254, 258 (8th Cir.1979)). *See also United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1103 n. 3 (D.Del.1988).

■ 7. Although HUD's Audit Guide for Multi–Family Properties does not give a precise definition of reasonable and necessary operating expenses, it definitively states that the repayment of owner advances is not one. Audit Guide for HUD Multi-family Properties, IG 4372.1 CHG–1(d) (1979). Other courts have also followed this logic. *See Thompson*, 408 F.2d at 1080 (citing *Thompson*, 272 F.Supp. at 787).

■ 8. In this case, until Woodbrook provided HUD with a complete audit of 1988 expenditures, HUD did not know that the repayment of advances to Rockwood and Wyckford involved the repayment of owner advances. HUD had no knowledge regarding the ownership of Rockwood or Wyckford. HUD was not involved in the financing of those properties and HUD did not obtain any ownership information concerning those properties until August 18, 1992, when Woodbrook submitted its long-overdue audit disclosing that a partner of Woodbrook was also a partner in the entities which owned Rockwood and Wyckford. Mr. Burch testified that the identity of interest between the ownership entities of Woodbrook, Rockwood, and Wyckford was a fact which HUD considered material. Given the date of the audit, this action was brought within six years of the "latest date that the Secretary discover[ed] any use of project assets and income in violation of the regulatory agreement or any applicable regulation." 12 U.S.C. § 1715z–4a(d). Thus, the claim concerning the payments to Rockwood and Wyckford is timely. *See also Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 862 (10th Cir.1993) (holding that if government is unaware of material fact, statute of limitations can be tolled).

9. Either Harvey authorized that the payments to Rockwood and Wyckford be made, or Deci–Ma Management as agent for Woodbrook Associates made these payments. According to the Regulatory Agreement, liability attaches to the partners of Woodbrook Associates "for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions [of the Regulatory Agreement]." (Pl.'s Ex. 2, ¶ 20B).

10. Because Harvey has a common ownership interest in Woodbrook, Rockwood and Wyckford, the repayment of advances to Rockwood and Wyckford by Woodbrook constituted the repayment of owner advances. When surplus cash does not exist, the repayment of owner advances is expressly prohibited unless prior approval from HUD has been obtained. (Pl.'s Ex. 1a, April, 1979, Audit Guide for HUD Multi–Family Properties, IG 4372.1 CHG–1). Accordingly, the payments to Rockwood and Wyckford violated 12 U.S.C. § 1715z–4a.

11. Based on the foregoing, this Court grants judgment on Count II of the Second Amended Complaint (the "Complaint") and awards the United States double damages in the amount of $13,650.00 plus interest, attorneys fees, and all costs related to this Count.

■ 12. HUD regulations direct that Chateau should have been paid by Deci–Ma Management out of its substantial management fee. If concerns existed regarding increasing the number of tenants at Woodbrook Apartments, the management company is employed to and paid for addressing those concerns.

13. HUD Handbook 4381.5 at section 2–14, A(6) states that "[t]he management fee must pay for salaries, fringe benefits, office expenses, fees and contract costs incurred in analyzing and solving project problems." (Pl.'s Ex. 1b). The market studies performed by Chateau, Inc. are costs to "solve project problems." Specifically, the studies provide information that

the management company can use to determine whether to raise or lower rental rates, provide rental incentives, etc. Given the purpose of the payments and the HUD handbook section which delineates the types of items to be paid by the management company, the payments for market studies with HUD funds do not constitute expenses necessary and reasonable to the operation of Woodbrook Apartments. In fact, even Woodbrook's 1992 audit notes that the market studies constitute "non-operating" expenses of the project. (Pl.'s Ex. 11).

14. In addition, HUD has always objected to the payment for these market studies by Woodbrook. HUD's interpretation of its own regulations should be given controlling weight in this case. Under the test outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Indeed, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. 2778. "An agency's interpretation of its own regulation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Green v. Shalala,* 51 F.3d 96, 100 (7th Cir.1995) (quoting *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)) (other citations omitted). "[T]he court must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Id.* (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)). The court finds no such error or inconsistency in HUD's interpretation. The payments in question were not reasonable and necessary operating expenses.

15. In light of the agency's determination and this Court's examination of the facts and law, the payments to Chateau out of project funds were not for reasonable or necessary operating expenses.

16. Because the payments made to Chateau, Inc., for "market studies" were not reasonable and necessary operating expenses, the United States is entitled to judgment in the amount of double damages of $49,620.00 for the payments to Chateau, in addition to interest, attorneys fees, and all costs relating to the action.

17. The payment of the bankruptcy-related expenses in this matter out of project income was done for the benefit of the partnership/owners, not the project. As such, these expenses cannot be characterized as reasonable operating expenses.

18. This Court finds that case law supports the contention that the payment of bankruptcy-related expenses is not a reasonable and necessary operating expense of the project. *See Frank,* 587 F.2d at 927 ("payment of substantial amounts of project funds as fees to various law firms for services rendered in connection with the administrative dispute ... were not incidental to the operation or maintenance of the project but were related to the personal investment interests of the mortgagor partnerships" held not operating expenses); *Thompson,* 408 F.2d at 1080–81 (finding payment for attorneys fees and withdrawal of funds to reimburse partners for prior advances with project funds were not reasonable expenses—"[t]o interpret the language of the regulatory agreement to validate these withdrawals would deny the claim of the party having security ... in favor of defaulting entrepreneurs who happened to have immediate control over the checkbook."); *Berk & Berk,* 767 F.Supp. at 598 (holding that expenses which benefit the owner rather than the property are not operating expenses and disallowing foreclosure related attorneys

fees); *RLA of Madison*, 177 B.R. 78 (holding that debtor may not use funds in which HUD has a security interest to pay its pre or postpetition attorney fees. Such payments violated HUD's regulatory agreement and were not incurred primarily for HUD's benefit); *Tampa Bay Briarwood Assoc.*, 118 B.R. 126 at 129 ("attorneys fees incurred for services rendered in connection with the bankruptcy were not expenses necessary to the actual operation of the project"); *Garden Manor Assoc.*, 70 B.R. 477 at 482 ("[O]perating expenses are expenses arising from the everyday operation and maintenance of the project. That term cannot be construed to include legal fees ... paid to prevent HUD foreclosures. These are partnership expenses that may not be paid with project income if there is no surplus cash."); *Lambert II*, 63 B.R. at 176 (bankruptcy retainer paid to law firm not reasonable operating expense); *In re Hil'Crest Apartments*, 50 B.R. 610, 612 (Bankr.N.D.Ill.1985) (holding that bankruptcy legal fees are not reasonable operating expenses).

19. HUD has never considered the payment of bankruptcy trustee fees, bankruptcy attorney fees, or other bankruptcy-related fees to be necessary and reasonable operating expenses of a HUD financed or insured property as defined in paragraph d in the Audit Guide for HUD Multi–Family Properties, IG 4372.1 CHG–1. (Pl.'s Ex. 1a).

■ 20. For purposes of liability under the Regulatory Agreement and 12 U.S.C. § 1715z–4a, there is no distinction between Woodbrook Associates and the debtor in possession ("DIP") in the bankruptcy of Woodbrook Associates. (*See e.g.*, Pl.'s Ex. 17), *In re Woodbrook Assoc.*, No. 90–7323–RWV–11, slip op. at 6 (Bankr.S.D.Ind. Mar. 14, 1996). *Accord RLA of Madison*, 177 B.R. 78; *Tampa Bay Briarwood Assoc.*, 118 B.R. at 129; *Garden Manor Assoc.*, 70 B.R. at 482; *Lambert II*, 63 B.R. at 176; *Hil'Crest Apartments*, 50 B.R. at 612. Functioning as the DIP for purposes of a bankruptcy proceeding does not nullify the debtor's identity as a party to the Regulatory Agreement, nor deprive the United States of its ability to utilize its remedy under 12 U.S.C. § 1715z–4a to sue one who violate the terms of the Regulatory Agreement. This action is one seeking enforcement of the terms of the Regulatory Agreement, and Congress has provided that the United States' remedy under the statute is "in addition to any other remedies available," 12 U.S.C. § 1715z–4a(e), presumably so that HUD can achieve the goals of the National Housing Act.

21. In light of the foregoing, the Court grants judgment to the United States for double damages of $78,912.00 plus interest, attorneys fees, and all costs concerning the bankruptcy-related payments.

■ 22. General partner travel expenses are not reasonable and necessary to the project in this case. According to HUD Handbook 4381.5:

Asset management includes: (2) periodic owner visits to the project to review the agent's performance.... Asset management costs must NOT be billed against the project account. These costs may be paid only from amounts available for distribution to owners, in accordance with the terms of the Regulatory Agreement and HUD Handbook 4670.2.

(Pl.'s Ex. 1c, section 2–16(A) and (B) (emphasis in original)). Because the project was in default and no surplus cash existed, no distributions of income should have been made to a general partner, for travel or otherwise, without HUD's consent.

23. In the event that the travel expenses were generated because Charles Harvey attended bankruptcy hearings, the payment of those expenses using assets and income of Woodbrook Apartments is still prohibited. The analysis regarding the other bankruptcy-related expenses applies equally to these payments. The travel of a general partner to appear at a hearing related to the partnership's bankruptcy is not a necessary and reasonable expense of the property, but rather an expense of the partnership.

24. Therefore, judgment on behalf of the United States for double damages of $7,774.00 plus interest, attorneys fees, and all costs concerning general partner travel expenses is granted.

■ 25. Payments made for secretarial services were made in violation of the Regulatory Agreement because the books and records reveal that these payments were not for reasonable operating expenses of the project. The United States is granted judgment for double the payments, or $4,568.00 plus interest, attorneys fees, and all costs relating to the payments.

26. By stipulation, the parties have agreed that the maximum amount that the United States could recover in principal in this action is $134,524. (Stip.25). This result is calculated by doubling the payments made in violation of the Regulatory Agreement, or $154,524, and subtracting the $20,000 paid to the United States by the other general partners of Woodbrook Associates pursuant to a settlement agreement those partners entered into with the United States for dismissal from this action.

### Conclusion

As explained previously, judgment should be awarded to the United States and against the Defendant on all counts of its Complaint. Therefore, judgment will be entered in favor of the United States in the amount of $134,524 plus interest, attorneys' fees, and all costs related to this litigation pursuant to 12 U.S.C. § 1715z–4a(c).

The United States will have thirty days to submit its estimate of reasonable attorney fees and costs related to this action, complete with supporting documentation for the estimate. The Defendant will then have fifteen days to file any objections to that estimate. If the Defendant does file objections, the United States will have seven days to file any reply, if it so chooses. Judgment will be entered following the determination of the attorney fees and costs.